**Electronically Filed
Intermediate Court of Appeals
CAAP-13-0000531
27-FEB-2015
08:06 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

---oOo---

NOS. CAAP-13-0000531,
CAAP-13-0000551, AND CAAP-13-0000615

**NO. CAAP-13-0000531**

WILLIAM A. ARTHUR, SR., Individually, and
THE ESTATE OF MONA ARTHUR thru William A. Arthur Sr.
as the Personal Representative,
Plaintiffs/Appellees,
v.
STATE OF HAWAIʻI, DEPARTMENT OF HAWAIIAN HOME LANDS;
KAMEHAMEHA INVESTMENT CORPORATION; DESIGN PARTNERS INC.;
COASTAL CONSTRUCTION CO., INC.; ASSOCIATION OF KALAWAHINE
STREAMSIDE ASSOCIATION; SATO AND ASSOCIATES, INC.;
DANIEL S. MIYASATO, INC.,
Defendants/Appellees,
and
JOHN and MARY DOES 1-50, DOE PARTNERSHIPS 1-50,
DOE CORPORATIONS 1-50, and OTHER DOE ENTITIES 1-50,
Defendants

---

KAMEHAMEHA INVESTMENT CORPORATION,
Third-Party Plaintiff/Appellee,
v.
KIEWIT PACIFIC CO.,
Third-Party Defendant/Appellee

---

STATE OF HAWAIʻI, DEPARTMENT OF HAWAIIAN HOME LANDS,
Third-Party Plaintiff-Appellee,
v.
KIEWIT PACIFIC CO.,
Third-Party Defendant-Appellee

---

KIEWIT PACIFIC CO.,
Fourth-Party Plaintiff/Appellee,

v.
PACIFIC FENCE, INC., et al.,
Fourth-Party Defendant/Appellant

**NO. CAAP-13-0000551**

WILLIAM A. ARTHUR, SR., Individually,
and THE ESTATE OF MONA ARTHUR thru
William A. Arthur Sr. as the Personal Representative,
Plaintiffs/Appellants/Cross-Appellees,
v.
STATE OF HAWAI'I, DEPARTMENT OF HAWAIIAN HOME LANDS;
KAMEHAMEHA INVESTMENT CORPORATION; DESIGN PARTNERS INC.,
Defendants/Appellees/Cross-Appellees
and
COASTAL CONSTRUCTION CO., INC.;
SATO AND ASSOCIATES, INC.; AND DANIEL S. MIYASATO,
Defendants/Appellees/Cross-Appellants,

---

KAMEHAMEHA INVESTMENT CORPORATION,
Third-Party Plaintiff/Appellee/Cross-Appellee,
v.
KIEWIT PACIFIC CO.,
Third-Party Defendant/Appellee/Cross-Appellee

---

KIEWIT PACIFIC CO.,
Fourth-Party Plaintiff/Appellee/Cross-Appellee,
v.
PACIFIC FENCE, INC.,
Fourth-Party Defendant/Appellee/Cross-Appellee

**NO. CAAP-13-0000615**

WILLIAM A. ARTHUR, SR., Individually, and
THE ESTATE OF MONA ARTHUR thru William A. Arthur Sr.
as the Personal Representative,
Plaintiffs/Appellees,
v.
STATE OF HAWAI'I, DEPARTMENT OF HAWAIIAN HOME LANDS;
KAMEHAMEHA INVESTMENT CORPORATION; COASTAL CONSTRUCTION
CO., INC.; ASSOCIATION OF KALAWAHINE STREAMSIDE ASSOCIATION;
SATO AND ASSOCIATES, INC.; DANIEL S. MIYASATO, INC.,
Defendants/Appellees
and
DESIGN PARTNERS, INC.,
Defendant/Appellant,

---

KAMEHAMEHA INVESTMENT CORPORATION,
Third-Party Plaintiff/Appellee,
v.
KIEWIT PACIFIC CO., Third-Party Defendant/Appellee

---

KIEWIT PACIFIC CO.,
Fourth-Party Plaintiff/Appellee
v.
PACIFIC FENCE, INC.,
Fourth-Party Defendant/Appellee
and
JOHN DOES 1-5, DOE CORPORATIONS 1-5, DOE PARTNERSHIPS 1-5,
ROE NON-PROFIT ORGANIZATIONS 1-5, and
ROE GOVERNMENTAL AGENCIES 1-5,
Fourth-Party Defendants

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 05-1-1981-11)


FEBRUARY 27, 2015


FOLEY, PRESIDING J., FUJISE AND LEONARD, JJ.


OPINION OF THE COURT BY FOLEY, J.

This case arises out of an incident that occurred on or about November 10, 2003, and resulted in an alleged wrongful death, at the Kalawahine Streamside Housing Development (**Project**). The Project is located in Honolulu on twenty-seven acres of land owned by Defendant/Appellee/Third Party Plaintiff/Cross-Appellee State of Hawai'i Department of Hawaiian Home Lands (**DHHL**). Plaintiffs/Appellees/Appellants/Cross-Appellees William A. Arthur, Sr. (**William Arthur**), individually and the Estate of Mona Arthur, through William A. Arthur, as Personal Representative (collectively, **Arthur**) brought suit against DHHL, the developer Defendant/Appellee/Third Party Plaintiff/Cross-Appellee Kamehameha Investment Corporation (**KIC**), the general housing contractor Defendant/Appellee/Cross-Appellant Coastal Construction Co., Inc. (**Coastal**), the architecture firm Defendant/Appellee/Cross-Appellee/Appellant Design Partners, Inc. (**Design Partners**), the civil engineers Defendants/Appellees/ Cross-Appellants Sato and Associates, Inc. and Daniel S. Miyasato (collectively, **Sato**), and Defendant/Appellee Association of Kalawahine Streamside Association (**AOAO**) (collectively, **Defendants**). KIC and DHHL each filed a third-party Complaint for indemnification and contribution against the general site

3

development contractor, Third-Party Defendant/Appellee/Fourth-Party Plaintiff/Cross-Appellee Kiewit Pacific Company (**Kiewit**) Kiewit filed a fourth-party Complaint against the subcontractor who furnished and installed a chainlink fence, Fourth-Party Defendant/Appellant/Appellee/Cross-Appellee Pacific Fence Inc. (**Pacific Fence**). DHHL, KIC, Design Partners, Coastal, AOAO, Sato, Kiewit, and Pacific Fence (**Defendant Parties**) also filed counterclaims or cross-claims for indemnification and contribution.

On April 2, 2013, the Amended Final Judgment (**Amended Final Judgment**) and underlying orders were entered in the Circuit Court of the First Circuit[1] (**circuit court**). The Amended Final Judgment superseded the Judgment filed on January 9, 2012, and was entered in favor of DHHL, KIC, Design Partners, Coastal, AOAO, and Sato and against Arthur. The Amended Final Judgment was also entered in favor of Kiewit and against KIC in the Third-Party Complaint, and in favor of Pacific Fence and against Kiewit in the Fourth-Party Complaint. The Amended Final Judgment provided judgment on specific claims of contribution, equitable indemnity, and contractual defense amongst the parties. Three appeals and two cross-appeals resulted from the complaint filed by Arthur on November 4, 2005 (**Arthur's Complaint**) On June 4, 2013, this court filed an order consolidating appeal case nos. CAAP-13-0000531, CAAP-13-0000551, and CAAP-13-0000615 under case no. CAAP-13-0000531.

On appeal, Arthur contends the circuit court erred by:[2]

(1) granting AOAO's motion for summary judgment on any and all claims asserted by plaintiffs due to lack of causation;

(2) granting KIC's motion for partial summary judgment as to plaintiff's claim for punitive damages; and

(3) denying Arthur's motion for leave to file a

---

[1] The Honorable Karen T. Nakasone presided.

[2] Arthur's opening brief fails to comply with Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 28(b)(3),(4), and (7) because it does not include record references to page citations or volume numbers; point to "where in the record" alleged errors were objected to; or contain citations to "the parts of the record relied on." HRAP Rule 28(b) 4 and 7. Arthur's counsel is warned, future noncompliance may result in sanctions.

complaint against Kiewit.

On appeal, Pacific Fence contends the circuit court erred by:

(1) granting Kiewit's motion for partial summary judgment in 2007, which included the holding, "[a]ny obligation Kiewit has to defend KIC and [Sato] passes through Kiewit, as a matter of law, to Pacific Fence."

(2) granting KIC's motion for partial summary judgment in 2010, which included the holding that Pacific Fence had a joint and several duty to defend KIC from February 9, 2006;

(3) granting KIC's motion regarding Coastal in 2010;

(4) granting KIC's motion regarding Design Partners;

(5) granting KIC's motion for partial summary judgment regarding Kiewit and Sato in 2010;

(6) granting Kiewit's motion in 2010, which included the holding that Kiewit's obligation to reimburse KIC and/or make future payments for KIC's defense fees and costs passed through Kiewit as a matter of law to Pacific Fence; and

(7) holding that Pacific Fence was required to pay KIC fees and costs incurred for periods and in percentages set forth in an exhibit to the Amended Final Judgment.

On cross-appeal, Sato contends the circuit court erred by:

(1) holding that Sato had a joint and several duty to defend KIC as of December 15, 2005;

(2) finding that Sato was obligated to pay KIC fees or costs; and

(3) finding that Sato had a contractual duty to indemnify and defend KIC and a joint and several duty to defend KIC.

On cross-appeal, Coastal contends the circuit court erred by holding that:

(1) Coastal and Kiewit assumed KIC's contractual duty to defend DHHL in litigation and thus relieved KIC from obligations to defend DHHL;

(2) KIC's contractual duty to defend DHHL included defense of claims regarding the negligence or willful acts,

5

omissions, failure to act, or misconduct of DHHL;

(3) Coastal was bound to defend DHHL against all claims asserted in litigation and not only against claims attributable to work by Coastal or its subcontractors; and

(4) Coastal had a contractual duty to defend DHHL in litigation brought by Arthur under a contract between KIC and Coastal.

## I.    BACKGROUND

### A.    Background on Decedent's Death

On October 31, 2000, DHHL executed an Assignment of Lease and Consent with William Arthur and his wife, Mona Arthur (**Mona**), for their residence, located at 2273 Kapahu Street in Honolulu, Hawai'i (**Residence**).

A hillside was separated from the Residence by an open concrete drainage ditch and a chain link fence.  Mona accessed the hillside from the Arthurs' backyard by walking across a four-foot by eight-foot wooden board to cross the drainage ditch and then William Arthur would help her over the fence.  There was no gate on the fence that allowed access onto the hillside.  William Arthur and Mona went onto the hillside about three times a week, where Mona would wear sneakers with snow spikes attached to prevent her from sliding down the hill.  Four or five months after moving into the Residence, the Arthurs hired someone to clear bamboo from the hillside and thereafter the Arthurs planted ti leaves and flowers, then vines and grass, allegedly to prevent erosion.  William Arthur installed stepping stones on the hillside.

On the afternoon of November 10, 2003, Mona, age 66, and William Arthur, age 68, were gardening on the hillside. William Arthur left Mona on the hillside, spent five to fifteen minutes getting her ice water, returned and did not see Mona.  He spent two or three minutes sitting on a swing and then saw Mona's "head pop up from the ditch."  Mona was lying in the ditch and asking for help.  William Arthur asked his neighbors, Allen Bird (**Bird**) and Mark Gilbert (**Gilbert**) for help.  Bird testified that he did not see how Mona entered the ditch nor was aware of anyone else who saw her.  He also testified that the fence on the

upslope side of the ditch was not damaged and that Mona's clothing was not torn. William Arthur was not aware of Mona ever slipping or falling down the hillside prior to this incident.

Mona was treated for severe head injuries, lapsed into a coma, and died on March 9, 2004. Mona was unable to provide an account of the way she fell into the ditch.

## B. Defendant Parties' Contractual Relationships

By a Development Agreement dated January 16, 1998 (**KIC Contract**), DHHL engaged KIC to develop 26.5 acres of land for the Project. The KIC Contract provided: "[KIC] will be responsible for all on-site grading, fill and compaction work necessary for the Project in accordance with the plans and specifications approved by [DHHL]."

Section 17, "Indemnification" of the KIC Contract provided that KIC shall:

> Notwithstanding other provisions in this Agreement, [KIC] agrees to pay, defend, indemnify, and hold harmless [DHHL] from any and all claims of any person . . . which arise out of or in connection with the construction of any unit of the Project, the sale of the units in the Project or any design or construction defects which arise or are made within one (1) year after completion.
>
> [KIC] accepts all risks with respect to which [KIC] will be responsible for disclosing to purchasers and defend, indemnify, hold harmless [DHHL] against all claims made by any homeowner or other person arising out of damage resulting from such risk or from non-disclosure or inadequate disclosure.
>
> [KIC] shall be developing and constructing the Project in [KIC's] own behalf and shall pay, indemnify, defend, and hold [DHHL] harmless from all claims, demands, lawsuits, judgments deficiencies, damages (whether paid by [DHHL] as part of a settlement or as a result of a judgment) and expenses, including attorney's fees and all costs of suit, made against [DHHL] or incurred or paid by [DHHL] arising out of or in connection with [KIC's] development and construction of the Project.
>
> Section 17 shall not cover the negligence or willful acts, omissions, failure to act, or misconduct of [the Hawaiian Homes Commission], [DHHL], or its employees and agents either related to the development of this Project or related to the completion of [DHHL's] authorized mission.

The KIC Contract also required KIC to draft or provide documents, including a declaration of covenants, conditions, and restrictions that would run with the Project land and be "legally binding upon all owners of units in the Project." Arthur would later claim that DHHL and AOAO advised homesteaders, including

himself and Mona, to landscape hillsides behind their homes.

The "Declaration of Covenants, Conditions, and Restrictions for Kalawahine Streamside" (**Project DCCR**) includes the following provisions:

> 5.02 **RESIDENTIAL LOTS: USES AND RESTRICTIONS.** Each Residential Lot shall be for the exclusive use and benefit of its Owner, subject, however, to the following covenants, conditions and restrictions:
>
> . . . .
>
> (d) Each Owner shall landscape and plant ground covering on such Owner's Residential Lot to prevent erosion and runoff. Each Owner shall maintain all Improvements erected on such Owner's Residential Lot and all landscaping and vegetation planted on such Residential Lot in good, clean and neat condition and repair . . . .
>
> . . . .
>
> 5.09 **SPECIAL CONDITIONS.** The Owner of each Residential Lot, by acceptance of a Lease for such Residential Lot, shall be deemed to acknowledge, accept and agree to the following:
>
> . . . .
>
> (d) STEEP SLOPES. Each Owner acknowledges and understands that such Owner's Residential Lot will have a steep slope, either uphill or downhill. Each Owner acknowledges and understands that such Owner will be responsible for maintaining and landscaping such Owner's Residential Lot in a manner that (1) will not prevent proper drainage . . . . (2) will not promote soils erosion . . . . Each Owner understands and agrees that such Owner will be responsible for maintaining such Owner's Residential Lot so that rocks and other debris do not slide or fall into any Improvements or any other portion of the Project. Each Owner understands and agrees that such Owner will be responsible for all damage and injury caused by such sliding or falling rocks and other debris, or as a result of the improper maintenance or landscaping of such Owner's Residential Lot, and agrees to indemnify, defend, and hold [KIC], [DHHL], and [AOAO] harmless from and against any claim for loss resulting from such circumstances.

In addition to hiring KIC as the Project developer, DHHL also employed its own Project manager and at least two land development engineers.

By a Project Consultant Agreement dated February 24, 1998 (**Design Partners Contract**), KIC hired Design Partners to design houses for the Project. Paragraph 7 of the Design Partners Contract provided:

> 7. **INDEMNITY BY CONSULTANT.** [Design Partners] hereby agrees to indemnify, defend and hold harmless Developer, and each of its officers, directors and employees, from and against any and all claims, demands, losses, liabilities, actions, lawsuits, proceedings, judgments, awards, costs and

expenses (including reasonable attorneys' fees), arising directly or indirectly, in whole or in part, out of work undertaken by [Design Partners] outside the scope of this Agreement and/or out of the negligence or any willful act or omission of [Design Partners], or any of its officers, directors, agents or employees, in connection with this Agreement or [Design Partner's] services or work hereunder, whether within or beyond the scope of its duties or authority hereunder. The provisions of this Section shall survive completion of [Design Partner's] services hereunder and/or the termination of this Agreement.

By a Project Consultant Agreement dated March 10, 1998 (**Sato Contract**), KIC engaged Sato as the civil engineering firm for the Project. Paragraph 7 of the Sato Contract was identical to that of the Design Partners Contract.

By a Standard Form of Agreement Between Owner and Contractor dated April 16, 1999 (**Kiewit Contract**), KIC engaged Kiewit to complete all grading and site improvements. The Kiewit Contract was executed between the owner (KIC) and the contractor (Kiewit), and specified that Sato would be the architect. Under the Kiewit Contract, KIC would pay Kiewit $5,263,381.50 for work performed. Section 3.18.1 of the Kiewit Contract provided:

[t]o the fullest extent permitted by law, [Kiewit] shall indemnify, defend, and hold harmless [KIC], [Sato], [DHHL] . . . from and against all claims, damages, losses, costs, and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other that the Work it self) including loss of use resulting therefrom, but only to the extent caused in whole or in part by any negligent acts or omission of the Contractor, a Subcontractor, . . . or anyone for whose acts they may be liable, regardless of whether such claim, damage, loss, or expenses is caused in part by a party indemnified hereunder.

By a Standard Form of Agreement Between Owners and Contractor dated July 26, 1999 (**Coastal Contract**), KIC engaged Coastal to build houses for the Project. The Coastal Contract contained an indemnity clause under paragraph 3.18.1 of Amendments to the General Conditions of the Contract For Construction that was essentially the same indemnity clause as in the Kiewit Contract.

By a subcontract dated October 15, 1999, Kiewit subcontracted construction of the chain link fence to Pacific Fence (**Pacific Fence Subcontract**) for approximately $18,235.74.

Section 11 of the Pacific Fence Subcontract contained an indemnity clause in favor of Kiewit, KIC, and DHHL, providing in pertinent part:

> **Section 11. INDEMNIFICATION.** To the fullest extent permitted by law, [Pacific Fence] specifically obligates itself to [Kiewit], [Kiewit's] surety, and [KIC] and any other party required to be indemnified under the [Kiewit Contract], jointly and severally, in the following respects, to-wit:
>
> . . . .
>
> (b) To defend and indemnify them against and save them harmless from any and all claims, suits, liability for damages to property including loss of use thereof, injuries to persons, including death, and from any other claims, suits or liability on account of acts or omissions of [Pacific Fence] . . . whether or not caused in part by the active or passive negligence or other fault of a party indemnified hereunder; provided however, [Pacific Fence's] duty hereunder shall not arise if such claims, suits, or liability, injuries or death or other claims or suits are caused by the sole negligence of [Kiewit], unless otherwise provided in the [Kiewit Contract].
>
> . . . .
>
> (f) To assume toward [Kiewit] all obligations and responsibilities that [Kiewit] assumes toward [KIC] and others, as set forth in the [Kiewit Contract], insofar as applicable, generally or specifically, to [Pacific Fence's] work.
>
> To the fullest extent permitted by law, [Pacific Fence] shall defend and indemnify [Kiewit], [Kiewit's] surety, [KIC], and other indemnified parties against, and save them harmless from, any and all loss, damage, costs, expenses and attorneys' fees suffered or incurred on account of any breach of the aforesaid obligations and covenants, and any other provision or covenant of this Subcontract. Notwithstanding the above, [Kiewit] at is sole discretion reserves the right to defend any one or all of the following, [KIC], other indemnified parties, . . . and itself. Such election to defend by [Kiewit] shall not in any way limit [Pacific Fence's] responsibility to indemnify and hold harmless as provided herein.

According to KIC's project manager for the Project, Elton Wong (**Wong**), "[b]ased on the input from the design professionals, it was decided that the steeply sloped portions of the higher elevations of the [Project] would be left in the natural condition." Sato's design for the Project's drainage system included:

> a series of shallow (2 ft. deep) surface drainage ditches that were intended to capture the sheet flow of water from the higher elevations and divert the water around the homes. The drainage ditches are located in an eight foot wide drainage easement that runs across the backyards of the uphill properties.

Sato's plan also included a single, unbroken debris fence on the upslope side of two-foot deep surface drainage ditches, allegedly pursuant to their understanding that the fences were intended solely for the collection of debris. The height of the debris fence as originally specified by Sato was to be four feet.

Prior to 1998, Sato's plans were presented to DHHL for review and comment, as well as to the City and County of Honolulu's Department of Planning and Permitting. By facsimile dated September 2, 1998, DHHL's Project manager Michele Otake (**Otake**) sent handwritten comments from a DHHL land development engineer, Gerald Lee (**Lee**) that included a concern regarding the four foot height of the debris fence. On or about September 9, 1998, Wong discussed Lee's concern with Richard Fujita (**Fujita**), another DHHL land development engineer, and they "concurred that the debris fence would be reduced in height from four (4) feet to two (2) feet in order to facilitate access to the hillside and for ease of maintenance of the ditch and the associate [sic] easement." These plans, Drainage Ditch Detail for Ditches A, B, C, and D, which were Sheet C-14 of Sato's Construction Plan, were approved by DHHL and Sato.

By letter dated January 5, 1999, Wong wrote to Sato instructing him to provide comments on the construction plans revised in December 1998, including reference to "O. Sheet C-15: Change 4' high chain link fence and post to 2'." Because KIC's initial construction contractor withdrew their bid, KIC prepared a new bid package on February 24, 1999, which included plans that depicted a two foot high fence on the upslope side of the drainage ditches. According to Wong, the change from a four-foot to a two-foot fence "was not made in order to reduce the cost of the site work contract, but rather to implement a design that was perceived to be better than the prior design in light of the purpose of the debris fence."

## C. Expert Testimonies

Arthur introduced expert testimonies and reports by Richard Gill, Ph.D. (**Dr. Gill**) of Applied Cognitive Sciences, dated January 2, 2009 (**Dr. Gill's Report**), and by Laura L.

Liptai, Ph.D. (**Dr. Liptai**) of Biomedical Forensics, dated December 19, 2008 (**Dr. Liptai's Report**). Dr. Gill's Report stated the following:

> [I]t is our opinion that the concrete drainage canal, its associated approximately 2 foot high fence, and the surrounding terrain . . . created an unreasonably dangerous condition at the time of [Mona's] falling incident. It was foreseeable that an incident similar to [Mona's] would occur if this defective and hazardous condition was not corrected.

Dr. Gill's Report opined the record was "replete with examples that demonstrate . . . [Defendants'] failure to conduct any meaningful safety or hazard analysis" of the drainage canal.

Dr. Liptai's Report set forth a biomedical and mechanical engineering analysis of Mona's November 10, 2003 incident based on "information provided to date . . . literature review, analysis, and [Dr. Liptai's] knowledge, experience, and education." Her report stated, "[Mona's] general orientation at impact was inverted cranial (head leading). This is consistent with the short fence acting as a trip mechanism which caused [Mona's] center of gravity to rotate over the 21" fence in an inverted cranial (head leading) posterior/lateral (backwards/side) orientation."

Dr. Liptai's Report concluded that "the short fence likely generated the tripping mechanism that lead [sic] to the inverted cranial (head leading) orientation with impact to the posterior lateral (back/side) of the cranium. The unforgiving nature of the concrete impact surface, as well as the increased fall height generated by the uncovered ditch, further contribute to the possibility of head injury."

A report by Douglas E. Young, Ph.D. (**Dr. Young**), of Exponent Failure Analysis Associates, dated November 23, 2009 (**Dr. Young's Report**) was attached to KIC's motion for partial summary judgment on Arthur's claim for punitive damages, filed on March 2, 2010. Dr. Young's Report concluded that the design of the ditch and fence did not pose an undue risk to individuals who behave prudently and with proper care and warnings would not have prevented the subject accident.

In Dr. Young's March 31, 2010 deposition, he stated that by his use of the phrase "potential hazard associated with

the subject hillside fence and ditch[,]" he was "referring to the inherent characteristics of these objects and structures that may cause harm to an individual or has the potential to cause harm." In his deposition, Dr. Young was asked, "with regard to the potential hazard associated with the hillside fence and ditch collectively, what were the inherent characteristics that may cause harm to an individual or has the potential to cause harm to an individual?" Dr. Young responded, "it's their proximity in terms of their locations and the kinds of interactions that individuals would use to move in those areas."

Dr. Young's Report concluded that "[t]he subject accident was not foreseeable to the [Defendant Parties]" and "[t]he potential hazard associated with the subject hillside fence and ditch was open and obvious to those who interacted with the subject hillside."

In her March 5, 2009 deposition, Dr. Liptai stated that she was asked to do a biomedical engineering analysis and affirmed that she was not asked to do an accident reconstruction. When asked, "how is it that you can say that it was a fence that was the likely tripping mechanism?" Dr. Liptai stated, "I know based on the physical evidence [of] how she landed, and I know that there's evidence, forceful evidence, in a given direction, and that is most likely consistent with the tripping mechanism of the fence."

By letter dated March 5, 2009, KIC's expert witness, Donald M. Schultz (**Schultz**), a Hawai'i developer and engineer, provided a report of his February 9, 2009 site visit and review of information related to Mona's incident at the Project. Schultz evaluated conditions of the Project and provided his opinion regarding the standard of care to be exercised by a developer in Hawai'i for a residential development. Schultz noted that KIC was responsible for providing the Project DCCR and concluded that KIC "provided reasonable, appropriate and sufficient notice, disclosure and guidance related to the existence of steel [sic] slopes and of the concrete drainage culvert, easements, and hillside rear yards of the individual lots." In regard to Section 5.09, "Special Conditions," Schultz

13

commented that "[t]his section identifies not only that lots will have steep slopes, but that the owner is responsible for the lot's maintenance. In addition, the owners are specifically advised of their responsibility and liability in the event of the owner's improper maintenance or landscaping of the owner's residential lot." In regard to the drainage culvert and debris barrier, Schultz stated the following:

> [t]he continuity of the [debris] barrier appears appropriate as breaks in the barrier would compromise its functionality as debris could easily pass through discontinuities. Additionally, the continuous nature of the debris barrier would discourage unnecessary access into the sloping natural areas beyond. The two-foot height of the debris barrier also facilitates cleanout of debris buildup without having to enter upon the sloping lot area beyond as maintenance could be accomplished by standing in the culvert and simply reaching over the barrier . . . . A higher continuous fence on one side of the culvert presents risks mitigated by the short debris barrier.

Schultz's report was attached to KIC's motion for partial summary judgment, filed March 2, 2010.

In their response to DHHL's interrogatories, dated March 9, 2009, Arthur stated, "[n]o one was present at the time of the accident, so the manner in which [Mona] ended up in the concrete ditch is unknown."

Gary T. Yamaguchi, PH.D., P.E. (**Dr. Yamaguchi**), another KIC expert witness, submitted a report dated November 30, 2009, which provided the results of his biomedical injury analysis of Mona's accident to KIC's counsel. Dr. Yamaguchi concluded that "[t]here are an infinite number of possible ways that [Mona] could have received her injuries and fallen into the channel. It is unlikely, however, that she could have fallen backwards over the fence and struck her head on the channel, because she did not have any scratches, abrasions, or lacerations on her posterior legs."

During his deposition, Wong said that he had discussed with Sato "how [residents] would get above that property to maintain it. And if [the chain link fence] was four feet, it would be very difficult and maybe unsafe to try and climb over it. Whereas a two-foot fence would have been easier to get over and still serve the purpose of catching the debris." Wong clarified his earlier deposition by saying that he had become

"aware that homeowners [in the Project] were crossing the ditch to get to the upper part of their property." Wong did not recall discussing an "alternative of placing breaks in the fence so people could travel from the lower portion of the property or the property below the drainage ditch to the property above the drainage ditch."

At Wong's deposition, Arthur's counsel asked Wong to examine Sheet C-14 of the construction plan. Wong stated, "[t]he sheet that you show on C-14 refers to a culvert, the drainage culvert, the side embankments that retains the wall, and there's a good sized [sic] drop into the side walls. So it protects people [from falling] into that area and get[ting] hurt."

> [Arthur's Counsel:] So you're saying that the chain link fence shown on C-14 was four feet to protect people from falling into the ditch and getting hurt?
>
> [Wong:] That's not a ditch.
>
> [Arthur's Counsel:] I'm sorry. From falling into the culvert and getting hurt?
>
> [Wong:] It's a culvert. Yes.
>
> [Arthur's Counsel:] Is that correct?
>
> [Wong:] Yes.

In his deposition on February 18, 2010, Kiewit's superintendent, Craig Oshimo (**Oshimo**) stated that he had "asked what the intent of the fence was. And it was indicated [to Kiewit] that it was a debris barrier." In response to an inquiry into whether he asked about "the fence being two feet high because it was related to [Kiewit Contract section] 10.2.1[,]" Oshimo said, "[i]t was related to make changes to the fence design, the ditch, you know, as a whole structure. It wasn't just one issue. But knowing what the intent of the fence was, you needed to kind of have that -- you need to know what the design intent of that structure is for, so you could make the appropriate changes." Oshimo also stated the following:

> When we asked the question about that drainage ditch and the fence and what the intent was, when we're [sic] told that the fence is going to be used for that, if we were told the fence was going to be used for something else and we feel that's not a safe application for the fence, of course we're going to say something.
>
> But that's why we ask the question. We ask the

question so we can understand what we're building, and then we build it right.

On March 4, 2010, Arthur's counsel deposed Corey Yamashita (**Yamashita**), a Kiewit engineer and Yamashita stated that Kiewit was "involved in reviewing designs now."

Arthur introduced "Exhibit 29," a photograph, as evidence that the two foot high fence was later replaced with a four foot high fence. Schultz, KIC's expert witness, described the four foot chain-link fence as part of the "rock fall mitigation effort" undertaken by DHHL in 2003. According to Schultz, "[s]ite observations confirm this four-foot intermittent chain link fence does not function as intended by the original design of the debris barrier" and was "not nearly as effective as the original [two foot continuous] debris barrier . . . ." Arthur argued that its reference to the installation of a new, higher fence, was not inadmissible because "measures that are taken after an event but that are predetermined before the event are not 'remedial' under [Hawai'i Rules of Evidence] Rule 407, because they are not intended to address the event." Ranches v. City & Cnty. of Honolulu, 115 Hawai'i 462, 467-68, 168 P.3d 592, 597-98 (2007) (emphasis in original). Arthur argued that Exhibit 29 would not constitute inadmissible evidence of subsequent remedial measures because Defendant Parties did not submit evidence that this was the intent of the alleged increased height of the fence.

**D. Procedural History**

On November 8, 2005, Arthur filed a First Amended Complaint (**First Amended Complaint**) against DHHL as the fee owner of the property, KIC as the developer for the Project within which the Residence was located, Design Partners as the architect of the Project, Coastal as the general contractor for the Project housing, AOAO who reviewed and controlled the design and development of each property, and Sato as the licensed engineer who prepared the construction plan for the Project. Kiewit, the general contractor for the Project site development, and Pacific Fence were not named in the First Amended Complaint.

By letters dated December 1, 2005 and December 15,

2005, KIC tendered claims to Kiewit and Sato. KIC's letters stated that KIC fully expected Kiewit, Sato, "and/or its insurer(s) to defend and fully indemnify KIC with respect to the allegations in the [First Amended Complaint]."

Similar cross-claims were filed as follows:

(1) December 5, 2005 by Design Partners against DHHL, KIC, AOAO, Coastal, and Sato, alleging that any injuries or damages to Arthur were the result of cross-claim Defendants' negligence or legal fault and, if Design Partners were found liable to Arthur, that cross-claim Defendants owed Design Partners indemnity and/or contribution;

(2) December 9, 2005 by AOAO against DHHL, KIC, Design Partners, Coastal, and Sato;

(3) December 9, 2005 by Sato against DHHL, KIC, Design Partners, Coastal, and AOAO;

(4) December 20, 2005 by Coastal against DHHL, KIC, Design Partners, AOAO, and Sato; [JROA doc 71 at 174]

(5) December 21, 2005 by KIC against DHHL, Design Partners, Coastal, AOAO and Sato;

(6) January 12, 2006 by DHHL against KIC, Design Partners, Coastal, AOAO, and Sato;

(7) January 31, 2006 by Kiewit against DHHL, Design Partners, Coastal, AOAO, and Sato;

(8) February 7, 2006 by AOAO against Kiewit and Pacific Fence;

(9) February 9, 2006 by KIC against Pacific Fence, which KIC later contended constituted sufficient notice of Pacific Fence's duty to defend. KIC requested the circuit court declare that Pacific Fence owed a joint and several duty to defend DHHL and KIC with respect to Arthur's allegations; and

(10) February 16, 2006 by Pacific Fence against DHHL, KIC, Coastal, Design Partners, AOAO, and Sato.

On December 21, 2005, KIC filed a third-party complaint against Kiewit, claiming Kiewit owed a contractual duty to defend and indemnify KIC. KIC alleged that Kiewit had "agreed to and did perform site work and infrastructure construction relating to the Project, including but not limited to the construction of

improvements which [Arthur] allege[s] herein was negligently performed."

On January 12, 2006, DHHL filed a third-party complaint against Kiewit alleging negligence in performing work on the Project in 1999.

On January 31, 2006, Kiewit filed a counterclaim against KIC and a fourth-party complaint against Pacific Fence.

By letter dated February 9, 2006, Kiewit tendered the defense and indemnity of claims against Kiewit to Pacific Fence.

On February 16, 2006, Pacific Fence filed counter-claims against Kiewit.

By letter dated March 1, 2006, KIC tendered their claims to Kiewit to Pacific Fence.

By letter dated March 6, 2006, DHHL tendered defense and indemnification of DHHL to KIC.

By letter dated March 29, 2006, KIC tendered the defense of DHHL, previously tendered to KIC, over to Kiewit.

By letter dated April 18, 2006, Kiewit tendered KIC's tender of DHHL's tender of its defense and indemnification to Pacific Fence.

By letters dated April 24, 2006, Kiewit and Sato separately responded to KIC's tender of its defense and, according to KIC's counsel, agreed to participate on a pro-rata basis in KIC's defense subject to conditions.

By separate letters dated May 4, 2006 and July 26, 2006, Pacific Fence's insurer, Island Insurance Co. (**Island Insurance**) agreed to provide a defense to Kiewit and a defense to KIC and DHHL.

On January 10, 2007, DHHL moved for partial summary judgment against KIC, requesting the circuit court find that KIC was contractually obligated to indemnify and defend DHHL under Section 17 of the KIC Contract.

On February 3, 2007, Arthur filed responses to KIC's interrogatories. Arthur noted that DHHL had "requested that the area [behind their residence] be maintained and cleaned" and referred to AOAO guidelines.

On March 5, 2007, KIC filed its own motion for partial

summary judgment, requesting the circuit court find that Coastal and Design Partners each owed a duty to defend and indemnify KIC under the Coastal Contract and Design Partners Contract.  KIC further requested the circuit court find that Design Partners, Kiewit, Sato, and Coastal had a duty to defend DHHL.  KIC argued that the intent of the indemnification provisions in its contracts with these other parties

> was to pass the duty to indemnify and defend against any third-party claims, including but not limited to claims of [Arthur] and DHHL, to the persons or entities performing the actual design and construction work from which a claim might be made.  KIC was in a "sandwich" position between DHHL and KIC's consultants and contractors.  By contract, KIC ensured that it would not be held "holding the bag," including the "defense bag," for the parties . . . that actually performed the design and construction work.

On March 23, 2007, oppositions to KIC's motion for partial summary judgment were filed by Sato, Design Partners, and Coastal.  Sato argued that it was already participating in the defense of KIC on a conditional basis and, based on correspondence between Sato's counsel and KIC's counsel, Sato did not owe any other party any duty to defend or indemnify.  Design Partners cited Arthur's interrogatory responses in support of its argument that the architectural services that Design Partners provided for the Project were unrelated to Arthur's claims of negligent design, construction, and maintenance of the hillside, debris fence, and culvert.  On March 23, 2007, Coastal filed its opposition to KIC's motion for partial summary judgment.

On March 29, 2007, Coastal filed its motion for summary judgment on KIC's cross-claim, in which Coastal sought a determination that it did not owe duties of defense or indemnification under the Coastal Contract.[3]

On March 30, 2007, Coastal filed its motion for summary judgment on Arthur's First Amended Complaint.  Coastal stated that under the Coastal Contract it had been responsible for only the construction of the Arthurs' Residence and not the grading, site work, civil engineering work, or fence or culvert construction where Mona was found.  Coastal argued that it was

---

[3]     The file stamp date on this motion is March 29, 2007, but later filings refer to this motion as "filed on March 30, 2007."

not liable under any of the claims alleged by Arthur.

On April 27, 2007, the circuit court granted in part and denied in part KIC's motion for partial summary judgment. The circuit court found that, because there were genuine issues of material fact regarding the cause and circumstances of Mona's accident, summary judgment was precluded at that time as to any party's right to indemnity from another party. The circuit court concluded that:

> 2.   Based upon the allegations in [Arthur's] First Amended Complaint and the terms of their respective contracts with [KIC],[Design Partners] and Coastal have a joint and several duty, as a matter of law, to defend KIC with respect to the claims asserted herein against KIC;
>
> 3.   Based upon the terms of their respective contracts with [KIC], [KIC's] duty to defend [DHHL] passes through, jointly and severally, to [Coastal] and [Kiewit] as a matter of law;
>
> 4.   Based upon the terms of their respective contracts with [KIC], [KIC's] duty to defend [DHHL] does not, as a matter of law, pass through to [Design Partners] and Sato.

(Emphasis added.)  The circuit court further provided that its findings were without prejudice to Coastal's motion for summary judgment on Arthur's First Amended Complaint, and Coastal's motion for summary judgment on KIC's cross-claim.

By letter dated May 1, 2007, Sato tendered the defense of Sato to Kiewit.  And Kiewit in turn tendered Sato's defense to Pacific Fence in a letter dated May 4, 2007.

By letter dated May 8, 2007, Island Insurance asserted that "Kiewit and KIC have independent duties to defend and indemnify [DHHL] which were neither delegable nor delegated to Pacific Fence" and that "Kiewit has an independent duty to defend and indemnify KIC which was neither delegable nor delegated to Pacific Fence."  Island Insurance further asserted that, "Kiewit's subcontract with Pacific Fence requires Pacific Fence to indemnify KIC against liability because of Pacific Fence's performance of work under the subcontract.  The subcontract does not require that Pacific Fence indemnify KIC against liability for Kiewit's performance of work which was not subcontracted to Pacific Fence."  Island Insurance made a similar assertion in regard to the tender of DHHL's defense and indemnification.

On May 22, 2007, the circuit court granted in part and

denied in part DHHL's motion for partial summary judgment. The circuit court found that KIC was obligated to defend DHHL, found a genuine issue of material fact as to DHHL's contractual right to indemnification from KIC for Arthur's Complaint against DHHL, and denied DHHL's motion as to the issue of KIC's duty to indemnify DHHL.

On May 22, 2007, the circuit court denied Coastal's motion for summary judgment on the First Amended Complaint.

On June 8, 2007, Kiewit filed a motion for partial summary judgment against Pacific Fence and asked the circuit court to find that Pacific Fence had a duty to defend Kiewit in the lawsuit, to assume Kiewit's duty to defend KIC and DHHL, and to assume the duty to defend DHHL that had passed through KIC to Kiewit. Kiewit argued that under Section 11(b) and (f) of the Pacific Fence Subcontract, Pacific Fence agreed to assume Kiewit's defense obligations to KIC and others in regard to Pacific Fence's work, even though Arthur's complaints alleged claims outside of the indemnity provisions.

On July 18, 2007, the circuit court held a hearing on Kiewit's motion for partial summary judgment. Pacific Fence argued that the circuit court's April 27, 2007 order granting in part and denying in part KIC's motion for partial summary judgment did not establish the law of the case in regard to Pacific Fence's obligations. The circuit court responded "I understand that, and I'm assuming that's why [Kiewit] brought their motion, is [sic] because it was an outstanding issue." The circuit court stated that cases Pacific Fence cited in opposition to Kiewit's arguments, which relied on Pancakes of Hawaii, Inc. v. Pomare Properties Corp., 85 Hawai'i 286, 944 P.2d 83 (App. 1997), were "clearly distinguishable" and orally granted Kiewit's motion for partial summary judgment. Pacific Fence argued further that Kiewit's duty to defend Sato under the Kiewit Contract could not be "passed on" to Pacific Fence unless and until Kiewit acknowledged that it had a duty to defend Sato. The circuit court stated that it did not see how Kiewit could refuse to recognize its duty to defend Sato under the Kiewit Contract.

On August 8, 2007, the circuit court granted Kiewit's

motion for partial summary judgment against Pacific Fence. The circuit court found that Pacific Fence had a duty to defend Kiewit, KIC, DHHL, and Sato; that any duty to defend DHHL that had passed to Kiewit, passed through to Pacific Fence as a matter of law; and any obligation that Kiewit had to defend KIC and Sato also passed through to Pacific Fence.

On September 22, 2009, Coastal filed its renewed motion for summary judgment on the First Amended Complaint. Coastal argued that new facts had come to light since the circuit court's May 22, 2007 order denying their motion for summary judgment.

On December 3, 2009, Arthur filed a Second Amended Complaint, stating "[o]n or around November 10, 2003, [Mona] was gardening on the hillside when she slipped and fell, rolled down the slope of the hillside over a fence, fell into a drainage embankment and hit her head against the concrete walling." Arthur alleged DHHL, KIC, Coastal, Sato, and Design Partners were negligent with respect to the design, construction, and supervision of the construction of the hillside area; and that AOAO was additionally negligent with respect to inspection, maintenance, and warning regarding the hillside area, including the fence and culvert. Arthur alleged that Wong, KIC's Project manager, ordered Sato to lower the height of the chain link fence along the concrete drainage ditch from four feet to two feet thus reducing construction costs and increasing profits, and that Wong knew the fence was intended to protect people from falling into the drainage culvert. The Second Amended Complaint added a claim for punitive damages against KIC.

On February 25, 2010, the circuit court entered its "Order Granting [Coastal's] Renewed Motion for Summary Judgment on the First Amended Complaint (Filed November 8, 2005), Including Any Pending Amendment and [KIC's] Conditional Substantive Joinder," (**Order Granting Coastal's Renewed Motion for Summary Judgment**). The circuit court's order provided:

> 1. Summary judgment is hereby granted and entered in favor of [Coastal] and against [Arthur].
>
> 2. Partial summary judgment is hereby granted and entered in favor of [KIC] and against [Arthur] and all other parties hereto with respect to any and all claims by [Arthur] and any other party hereto against KIC arising out

of, resulting from, attributed to, connected with, or otherwise premised upon the work contracted to and/or performed by [Coastal].

 3. This order, summary judgment, and partial summary judgment shall apply to, among other things, [Arthur's] claims asserted in the [First Amended Complaint] and/or the [Second Amended Complaint].

 4. The foregoing summary judgment and partial summary judgment is without prejudice to and shall not effect [sic] KIC's rights and Coastal's duties pursuant to Order Granting in Part and Denying in Part [KIC's] Motion for Partial Summary Judgment Filed on March 5, 2007, filed on April 27, 2007, except that said summary judgments extinguish [Coastal's] duty to defend KIC beyond the date of the entry of this order, summary judgment, and partial summary judgment.

On March 9, 2010, Arthur filed its motion for leave to file a third amended complaint naming Kiewit as a defendant. Arthur's proposed third amended complaint (1) alleged Kiewit was negligent and should be subject to punitive damages because Kiewit constructed a two foot high fence and knew it was dangerous and would naturally and probably result in injury; (2) "state[d] and summarize[d] facts adduced at" Oshimo's February 18, 2010 deposition; and (3) considered the testimony of Yamashita, Kiewit's engineer who was assigned to the Project.

On March 16, 2010, Kiewit filed its opposition to Arthur's motion for leave to file an amended complaint.  On March 15, 2010, Pacific Fence filed its opposition and Sato filed its joinder to Pacific Fence's opposition on March 18, 2010.  On August 26, 2010, the circuit court denied Arthur's motion for leave to file a third amended complaint, specifying that it "agree[d] with the arguments and authorities advanced by [Kiewit] in its Memorandum in Opposition filed on March 16, 2010."

On April 7, 2010, Arthur filed its opposition to KIC's motion for summary judgment as to punitive damages.  Arthur attached Dr. Gill's Report, dated January 2, 2009 as "Exhibit 17", and Dr. Liptai's Report, dated December 19, 2008 as "Exhibit 18".

On April 8, 2010, AOAO filed its "Motion for Summary Judgment on Any and All Claims Asserted by Plaintiffs Due to Lack of Causation" (**AOAO MSJ**).  On June 9, 2010, Arthur filed their opposition to the AOAO MSJ.

On April 15, 2010, the circuit court held a hearing on KIC's motion for partial summary judgment on Arthur's claim for punitive damages and Coastal's motion for summary judgment.

On April 26, 2010, KIC filed another cross-claim against Pacific Fence, adding claims for defense and indemnification against allegations in Arthur's Second Amended Complaint.

On May 6, 2010, (1) KIC filed a substantive joinder to the AOAO MSJ and attached the accident reconstruction report from Dr. Yamaguchi as an exhibit; (2) KIC filed a motion for enforcement of the order granting in part and denying in part KIC's March 25, 2007 motion for partial summary judgment against Coastal, and (3) Pacific Fence filed a motion for partial summary judgment on all claims asserted against it in Kiewit's fourth-party complaint and cross-claims.

On May 11, 2010, KIC filed a motion for enforcement of the April 27, 2007 order granting in part and denying in part KIC's March 25, 2007 motion for partial summary judgment as against Design Partners.

On May 24, 2010, the circuit court granted KIC's motion for partial summary judgment as to Arthur's claim for punitive damages.

On May 28, 2010, KIC filed two motions. One motion requested partial summary judgment against Sato and Kiewit and for enforcement of an order granting its motion. The other motion requested partial summary judgment against Pacific Fence.

On June 17, 2010, the circuit court held a hearing on the AOAO MSJ and motions for substantive joinder filed by Sato, Design Partners, Kiewit, and KIC to the AOAO MSJ. The circuit court found there was "no genuine issue of material fact . . . that Dr. Liptai's opinion [was] based essentially on certain assumptions" and "[o]ther than what Dr. Liptai says, there's absolutely no other forensic evidence, for example, to explain how [Mona] got from where she was up to the point in time where Dr. Liptai's opinions take over."

On August 11, 2010, Sato filed its opposition to KIC's motion for partial summary judgment against Sato and Kiewit and

for enforcement of the order granting the motion, which had been filed on May 28, 2010.

On August 26, 2010, the circuit court denied Arthur's motion for leave to file a third amended complaint.

On August 26, 2010, the circuit court held a hearing on the parties' various motions. The circuit court noted the parties had not agreed upon an allocation of KIC's defense costs and therefore ordered a pro rata allocation, which did not assign KIC a share of its own defense costs.

On September 8, 2010, the circuit court granted summary judgment against Arthur and in favor of AOAO on any and all claims asserted by Arthur due to lack of causation, and granted substantive joinders by KIC, Design Partners, Sato, DHHL, Coastal, Kiewit, and Pacific Fence.[4]

On September 16, 2010, the circuit court granted Pacific Fence's motion for partial summary judgment.

On December 28, 2010, the circuit court granted Coastal's motion for summary judgment on cross-claims for contribution and implied indemnity, which extended to all cross-claims for contribution and for equitable and implied indemnity filed since the December 3, 2009 Second Amended Complaint. This order, together with the Order Granting Coastal's Renewed Motion for Summary Judgment, relieved Coastal of tort claims and cross-claims of contribution and indemnity.

On May 27, 2011, the circuit court granted KIC's motion for partial summary judgment against Sato and Kiewit. The circuit court found that Sato had a joint and several duty to defend KIC from December 15, 2005; Kiewit had a joint and several duty to defend KIC from December 1, 2005; KIC would furnish statements for fees and costs incurred in this matter for the period from December 1, 2005 through April 30, 2011; and that Sato and Kiewit were required to pay KIC's fees and costs for specified periods and in specified percentages. Kiewit and Sato were also required to pay their respective pro rata share of KIC's legal fees and costs from May 1, 2011 until such time as

---

[4] On January 9, 2012, the circuit court entered the final judgment confirming this order.

KIC's exposure to Arthur "arising out of or related to the work contracted to and/or performed by [Sato] and [Kiewit], respectfully [sic] is extinguished[.]"

On May 27, 2011, the circuit court granted KIC's March 25, 2007 motion for enforcement requiring Coastal to submit pro rata payment of KIC's defense costs according to specified periods and percentages. Coastal was to pay 50% of KIC's defense from December 1-14, 2005 (shared with Kiewit); 25% of KIC's defense from December 15, 2005 through February 8, 2006; and 20% of KIC's defense from February 9, 2006 through February 25, 2010 (with contributions from Sato, Kiewit, Pacific Fence, and Design Partners).

On May 27, 2011, the circuit court granted KIC's May 11, 2010 motion for enforcement against Design Partners.

On July 1, 2011, Kiewit filed a motion for enforcement of the August 8, 2007 order granting Kiewit's June 8, 2007 motion for partial summary judgment.

On August 31, 2011, the circuit court held a hearing on the various motions. Counsel for Kiewit stated that Kiewit was asking for enforcement of the circuit court's August 8, 2007 order, which decided that any obligation that Kiewit had to reimburse KIC's defense costs passed through to Pacific Fence. The circuit court determined it would grant the motion "for the same reasons that were previously the basis for its ruling relative to the [KIC] motions and more or less adopts the rationale in the Pancakes case[,] at 85 Hawaiʻi 286, a 1997 decision, regarding the duty to defend and that timely enforcement in this court's mind is appropriate."

On October 3, 2011, the circuit court granted Kiewit's July 1, 2011 motion for an enforcement of the August 8, 2007 order granting Kiewit partial summary judgment against Pacific Fence. This order found that Kiewit's obligation to reimburse KIC and to make future payments for KIC's defense fees and costs passed through Kiewit as a matter of law to Pacific Fence. The circuit court required Pacific Fence to reimburse KIC for the pro rata share of defense fees and costs allocated to Kiewit within the time period specified in the May 27, 2011 order granting KIC

partial summary judgment against Sato and Kiewit.

On November 17, 2011, the circuit court granted Coastal's petition for a determination of a good faith settlement. The petition found the $47,500 settlement between Coastal and KIC was executed in good faith, the settlement did not apply to claims of Coastal's obligation to defend DHHL, and that $49,459.35 would be credited against KIC's defense costs through February 25, 2010 for purposes of determining obligations of co-obligors in KIC's defense obligation.

On February 1, 2012, Arthur filed a notice of appeal from the January 9, 2012 Final Judgment in CAAP-12-0000064. On July 27, 2012, this court granted a motion to dismiss CAAP-12-0000064 for lack of jurisdiction because the January 9, 2012 Final Judgment did not specifically identify the claims on which the circuit court intended to enter judgment as required under Jenkins v. Cades Schutte Fleming & Wright, 76 Hawaiʻi 115, 119, 869 P.2d 1334, 1338 (1994).

On April 2, 2013, the circuit court entered its Amended Final Judgment.

On April 30, 2013, Pacific Fence filed its notice of appeal in case no. CAAP-13-0000531 from the Amended Final Judgment and eight underlying orders.

On April 30, 2013, Arthur filed its notice of appeal in case no. CAAP-13-0000551 from the Amended Final Judgment and thirty-three underlying orders.

On May 1, 2013, Coastal filed a notice of cross-appeal in case no. CAAP-13-0000551 from the Amended Final Judgment insofar as judgment was granted (1) to DHHL by virtue of the "Order Granting in Part and Denying In Part [DHHL's] Motion for Partial Summary Judgment Filed on January 10, 2007, which order was filed on May 22, 2007" and the "Order Granting in Part and Denying In Part [KIC's] Motion for Partial Summary Judgment Filed on March 5, 2007, which order was filed on April 27, 2007"; and (2) to KIC by virtue of "Order Granting in Part and Denying In Part [KIC's] Motion for Partial Summary Judgment Filed on March 5, 2007, which order was filed on April 27, 2007" and "the Order Granting [KIC's] Motion for Enforcement of Order Granting in Part

and Denying In Part [KIC's] Motion for Partial Summary Judgment Filed on March 5, 2007, which order was filed on April 27, 2007 filed May 27, 2011 . . . ."

On May 2, 2013, Sato filed a notice of cross-appeal in case no. CAAP-13-0000551 from the Amended Final Judgment and orders underlying that judgment, including but not limited to the "Order Granting [KIC's] Motion for Partial Summary Judgment Against [Sato] and [Kiewit], and for Enforcement of Order Granting Motion, filed on May 27, 2011."

On May 2, 2013, Design Partners filed its notice of appeal[5] in case no. CAAP-13-0000615 from the Amended Final Judgment, the "Order Granting In Part and Denying In Part [KIC's] Motion For Partial Summary Judgment Filed On March 5, 2007," and the "Order Granting [KIC's] Motion For Enforcement Of Order Granting In Part And Denying In [KIC's] Motion For Partial Summary Judgment Filed On March 5, 2007, As Against [Design Partners.]"

On June 4, 2013, case nos. CAAP-13-0000531, CAAP-13-0000551, and CAAP-13-0000615 were consolidated under CAAP-13-0000531 by order of this court.

## II. DISCUSSION

### A. Arthur's Appeal

#### 1. Summary judgment on Arthur's negligence claims was improper.

Arthur contends the circuit court erred by granting AOAO's MSJ in regard to Arthur's claims of negligent construction, maintenance, construction supervision, and lack of warning.

A moving party is entitled to summary judgment if:

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Hawai'i Rules of Civil Procedure (**HRCP**) Rule 56(c). To survive summary judgment, a party adverse to summary judgment "may not

_____

[5] The appeal filed by Design Partners under case no. CAAP-13-0000615 will not be considered here because Design Partners did not file an opening brief presenting their contentions.

rest upon the mere allegations or denials of the adverse party's pleading, [and] the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." HRCP Rule 56(e). "[S]ummary judgment is proper when the nonmoving party-plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Miyashiro v. Roehrig, Roehrig, Wilson & Hara, 122 Hawai'i 461, 475, 228 P.3d 341, 355 (App. 2010) (citing Exotics Hawai'i-Kona, Inc. v. E.I. Du Pont de Nemours & Co., 116 Hawai'i 277, 302, 172 P.3d 1021, 1046 (2007)) (format altered).

Arthur alleged DHHL, KIC, Design Partners, Coastal, and Sato were negligent in the design, construction, and supervision of the construction of the hillside area, and that AOAO was additionally negligent with respect to "inspection, maintenance and warning regarding the hillside area, including the fence and culvert." In order to prevail in their negligence claim, Arthur would have to establish that (1) AOAO had a duty "to conform to a certain standard of conduct[] for the protection of others against unreasonable risks"; (2) AOAO breached that duty; (3) there was "[a] reasonably close causal connection between the conduct and the resulting injury"; and (4) there was actual loss or damage as a result. Knodle v. Waikiki Gateway Hotel, Inc., 69 Haw. 376, 385, 742 P.2d 377, 383 (1987) (quoting W.P. Keeton, Prosser and Keeton on the Law of Torts § 30, at 164-65 (5th ed. 1984), format altered).

Arthur contends AOAO and Defendant Parties did not establish a lack of causation because they did not assert a set of facts indicating that a connection cannot be made between their breach of duties and Arthur's alleged injuries.

AOAO and Defendant Parties argued to the circuit court that Arthur would be unable to prove the causation element of his negligence claim because Arthur had admitted that the manner in which Mona fell into the ditch was "unknown." According to AOAO, because Arthur "admitted" to not knowing how Mona fell into the ditch, Arthur's causation claims require speculation or

conjecture. AOAO thus argues that there is "no circumstantial evidence in this particular case, even if looked at in the light most favorable to [Arthur], that would create genuine issues of material fact." This conclusion is unwarranted for several reasons.

Causation is established when it is "more likely than not [that the defendant's conduct was] a substantial factor in causing the harm complained of . . . ." Knodle, 69 Haw. at 385, 742 P.2d at 383 (quoting Bidar v. Amfac, Inc., 66 Haw. 547, 553, 669 P.2d 154, 159 (1983)). This determination "is normally a question for the jury . . . ." Knodle, 69 Haw. at 385, 742 P.2d at 383 (brackets, citation, and internal quotation mark omitted). Causation may be proven through circumstantial evidence. Wagatsuma v. Patch, 10 Haw. App. 547, 565, 879 P.2d 572, 583 (1994). In addition, a causal link may be inferred from an expert's testimony in light of the evidence admitted at trial.

Arthur submitted expert testimony from which a trier of fact could reasonably infer a causal link between Defendant Parties alleged negligence and Mona's injuries. Rapoza v. Parnell, 83 Hawai'i 78, 86, 924 P.2d 572, 580 (App. 1996). Dr. Liptai analyzed the event from the point when Mona was standing next to the fence. Dr. Liptai's Report concluded that "the short fence likely generated the tripping mechanism" that led to her fatal head injuries. Her report was based on site inspection photographs, medical records, expert reports, and depositions. Because it was unlikely that Mona would have sustained a brain injury from the fall if she landed onto grass, Dr. Liptai opined "even if [Mona] had slipped on the hill, been tripped by the fence and fallen onto grass, it would be unlikely that a brain injury would have been sustained." Dr. Liptai opined "[t]he short fence is responsible for altering the kinematics that caused the inverted cranial (head leading) orientation."

We conclude the circuit court erred by granting partial summary judgment to AOAO, KIC, Sato, and Design Partners.

2. **Summary judgment for KIC on Arthur's punitive damages claim was proper.**

Arthur contends the circuit court erred by granting

KIC's motion for partial summary judgment as to Arthur's claim for punitive damages. Arthur's Second Amended Complaint alleged that Wong, acting as KIC's agent, "ordered the fence lowered simply to increase [KIC's] profits, without consideration to the safety of persons such as [Mona]. He reduced the height of the fence knowing that residents, such as [Mona], were required to maintain the steep hillside." Arthur alleges that KIC's "overriding concern was for a minimum-expense operation[] regardless of the peril involved." Arthur further alleges KIC "acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference" so as to warrant punitive damages.

"[P]unitive damages are recoverable in tort action based on negligence." Masaki v. Gen. Motors Corp., 71 Haw. 1, 10, 780 P.2d 566, 572 (1989). "[T]o justify an award of punitive damages, 'a positive element of conscious wrongdoing is always required.' Thus, punitive damages are not awarded for mere inadvertence, mistake, or errors of judgment." Id. at 7, 780 P.2d at 571 (citation omitted). To prevail in a punitive damages claim,

> [a] plaintiff must prove by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences.

Id., 71 Haw. at 16-17, 780 P.2d at 575.

Clear and convincing evidence must "produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established, and requires the existence of a fact be highly probable." Id., 71 Haw. at 15, 780 P.2d at 574.

Arthur contends that KIC's failure to issue warnings and alleviate the hazard, in combination with its alleged knowledge of the "inherent risks" of the fence, constitutes conscious indifference to consequences in support of Arthur's claim for punitive damages.

The factual allegations underlying Arthur's Complaint fail to raise a genuine issue of material fact as to punitive

31

damages. Wong's instruction to reduce the height of the fence and knowledge that residents, including Mona, would access the hillside by climbing over the fence fails to establish KIC's conscious wrongdoing. See Iddings v. Mee-Lee, 82 Hawai'i 1, 11, 919 P.2d 263, 273 (1996) (providing the three-part test for conduct rising to the level of "wanton neglect"). Even if KIC's decision to lower the height of the debris fence to two feet was "motivated by a desire to cut costs and boost profits[,]" such a decision would not amount to a conscious element of wrongdoing necessary to support an award of punitive damages. Ass'n of Apartment Owners of Newtown Meadows ex rel. its Bd. of Directors v. Venture 15, Inc., 115 Hawai'i 232, 296-98, 167 P.3d 225, 289-91 (2007), as corrected on denial of reconsideration (Sept. 20, 2007).

> **3. The circuit court did not abuse its discretion by denying Arthur leave to file their third amended complaint against Kiewit.**

Arthur contends the circuit court erred by denying their March 9, 2010 motion to amend their complaint to add Kiewit as a defendant.

Under HRCP Rule 15(a)(2), "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." The "grant or denial of leave to amend under [HRCP] Rule 15(a) is within the discretion of the trial court and is subject to reversal on appeal only for an abuse of discretion." Keawe v. Hawaiian Elec. Co., Inc., 65 Haw. 232, 239, 649 P.2d 1149, 1154 (1982) (citation and internal quotation mark omitted). Reasons to deny leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment[.]" Bishop Trust Co., Ltd. v. Kamokila Dev. Corp., 57 Haw. 330, 337, 555 P.2d 1193, 1198 (1976) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962) (applying Federal Rules of Civil Procedure Rule 15(a)).

Arthur offers no reasonable explanation for their undue delay of more than four years in seeking to file a complaint against Kiewit. Arthur was served with KIC's Third Party Complaint, which identified Kiewit as a party, on December 21, 2005. KIC's complaint alleged that Kiewit had performed site work and infrastructure construction on the Project, including construction of improvements that Arthur alleged were negligently performed.

Kiewit contends it would have suffered delay and prejudice if the circuit court had granted Arthur leave to amend their complaint nearly five years after KIC filed their third-party complaint against Kiewit. Kiewit contends it would have to "expend additional resources to re-depose witnesses, re-depose expert witnesses both in Hawai'i and on the mainland, and retain new expert witnesses to address the direct claims of [Arthur]." The end date for discovery was April 1, 2010, three weeks after Arthur's March 9, 2010 motion for leave to amend, and would likely have to be reopened to allow for parties to conduct further discovery in light of new claims against Kiewit. Therefore, the circuit court did not abuse its discretion in denying Arthur's belated attempt to add Kiewit as a defendant.

**B. Sato's Appeal**

Sato's appeal includes the contention that Pancakes was wrongly decided and resulted in a "flawed" holding and conclusion. Sato urges this court to depart from precedent. This court has declined to "depart from the doctrine of stare decisis in the absence of some compelling justification." State v. Claunch, 111 Hawai'i 59, 67, 137 P.3d 373, 381 (App. 2006) (internal quotation marks and emphasis omitted) (citing Hilton v. South Carolina Pub. Ry. Comm'n, 502 U.S. 197, 202 (1991)).

**1. Pancakes was correctly decided.**

Sato contends the circuit court erred by concluding that Sato had a joint and several duty to defend KIC as of December 15, 2005, when KIC tendered its defense to Sato. The circuit court set forth this conclusion in its May 27, 2011 order granting KIC's May 28, 2010 motion for partial summary judgment, which required Sato and Kiewit to pay KIC's fees and costs

33

related to the Arthur case for specific periods and in specific percentages dating from KIC's tender of its defense to Sato. Sato contends the circuit court's ruling was erroneous, among other reasons, because Pancakes itself was "wrongly decided." In its motion for summary judgment, KIC argued that Sato and Kiewit had a joint and several duty to defend KIC as a matter of law and that their duty to defend KIC must be determined at the outset of the litigation using the "complaint allegation rule." See Pancakes, 85 Hawai'i at 291, 944 P.2d at 88. The "complaint allegation rule" refers to the principle that "the duty to defend is limited to situations where the pleadings have alleged claims for relief that fall within the terms for coverage of the insurance contract. Where pleadings fail to allege any basis for recovery within the coverage clause, the insurer has no obligation to defend." Id., at 291 944 P.2d at 88 (citations, internal quotation marks and brackets omitted).

According to Sato, the Sato Contract did not require Sato to either defend or indemnify KIC and was void to the extent that it required KIC to be indemnified for its own negligent or wilful misconduct. Sato contends its duty to defend and indemnify KIC, pursuant to the indemnity clause in Sato Contract, extends only to claims:

> 1. Arising directly or indirectly, in whole or in part, out of work undertaken by [Sato] outside the scope of the [Sato Contract], and/or
>
> 2. Arising out of negligence or any willful act or omission of Sato in connection with the [Sato Contract] or [Sato's] work, whether within or beyond the scope of its duties or authority hereunder.

(Emphases in original.)

Sato argues that they cannot be held liable for defense costs or indemnity obligations to KIC until wrongful conduct on the part of Sato "is shown to have occurred, and be causally related to claims asserted by [Arthur]," because the Sato Contract indemnity provision would not apply until that time.

Sato's conclusion relies on their argument that our holding in Pancakes was wrongly decided. In Pancakes, this court interpreted a clause in a management agreement (**Responsibility Clause**) between a managing agent, Pomare Properties Corporation

(**indemnitor-defendant**), and a realty corporation manager, Sofos
Realty Corporation (**indemnified-defendant**), which provided:

> except for the willful misconduct or gross negligence of
> [indemnified-defendant], [indemnitor-defendant] shall
> indemnify, defend and hold [indemnified-defendant] harmless
> from and against any and all claims, demands, losses,
> liabilities and damages of every kind and nature arising
> from any cause whatsoever when [indemnified-defendant]] is
> acting under this Agreement or the instructions of
> [indemnitor-defendant] or its designated
> representative . . . .

Pancakes, 85 Hawai'i at 289 n.2, 944 P.2d at 86 n.2.

Pancakes held that the law governing the duty of an
insurer to defend its insured under indemnity provisions of an
insurance contract applied to an indemnitor's duty to defend an
indemnitee under a general indemnity contract. The Pancakes
appeals court decided the indemnitor-defendants duty to defend
indemnified-defendant arose when the Pancakes plaintiff (Pancakes
of Hawai'i, Inc.) filed its complaint because (1) some of
Pancakes' claims did not involve "willful misconduct or gross
negligence" that was excluded from the subject Responsibility
Clause and (2) "portions of [the indemnified-defendant's] alleged
conduct were unquestionably leasing activities that fell within
the parameters of the management agreement." Pancakes, 85
Hawai'i at 295, 944 P.2d at 92.

Expanding an insurer's duty to defend based on the
"complaint allegation rule" to general indemnity contracts makes
sense "because if the duty to defend was determined only after
the ultimate issue of liability on each claim has been made, the
case would be fully resolved before the duty [to defend] was
triggered, and there would be nothing left to defend." Id., at
291, 944 P.2d at 88 (quotation marks omitted). The timing and
trigger of a duty to defend differs from those of a duty to
indemnify. In the case of indemnity agreements that limit the
liability of the indemnitor with a sole negligence exception,
such as the Sato Contract, "the duty to indemnify cannot be
determined initially, and sometimes it cannot be determined until
a verdict is rendered. Therefore, the duty to indemnify cannot
be used as the standard for the duty to defend." James E.
Joseph, Indemnification and Insurance: The Risk Shifting Tools

(Part I), 79 Pa. B. Ass'n Q. 156, 177-78 (2008) (footnote omitted).

In light of such reasoning and the lack of a competing argument in Pancakes, we "discern[ed] no logical reason why the duty to defend based on indemnity contracts should not follow the same philosophy [of imposing a duty to defend at the outset of litigation] used in the insurance context." Pancakes, 85 Hawai'i at 291-92, 944 P.2d at 88-89.

> In our opinion, the procedure used to determine the duty to defend based on indemnity contracts can follow the same procedure used in the insurance context. If a complaint alleges claims that fall within the coverage of the indemnity provision, then, according to the complaint allegation rule, the duty to defend begins. This is separate and distinct from the duty to indemnify. Once the trier of fact makes a determination on the claims in the lawsuit, the duty to indemnify will either arise or lie dormant. Claims falling within the indemnity provision will trigger the duty to indemnify, while claims falling outside the provision will relieve the indemnitor of his or her duty to indemnify. In our view, this is the only equitable interpretation that gives life to non-insurance indemnity clauses and prevents indemnitors from benumbing the duty to defend until after a case has been litigated.

Pancakes, 85 Hawai'i at 292, 944 P.2d at 89 (emphases added).

Once an indemnitor is found to have a duty to defend, "[t]he indemnitor must bear the cost of a defense whenever any of the claims asserted may potentially come within the scope of an indemnity agreement, and the defense must continue until it is clear that the liability cannot possibly come within the scope of the indemnity." Indemnification and Insurance, 79 Pa. B.A. Q. at 178 (citing Jacobs Constructors, Inc. v. NPS Energy Services, Inc., 264 F.3d 365, 376 (3d Cir. 2001)); Kiewit E. Co. v. L & R Constr. Co., 44 F.3d 1194 (3d Cir. 1995); Bituminous Ins. Companies v. Pa. Manufacturers' Ass'n Ins. Co., 427 F. Supp. 539, 548-49 (E.D. Pa. 1976). Contrary to Sato's contention that its duty to defend would not be triggered until wrongful conduct on the part of Sato "is shown to have occurred, and be causally related to claims asserted by [Arthur]," Sato's duty to defend KIC was triggered upon the filing of the complaint and/or the tender of KIC's defense to Sato and that duty encompassed all claims that could potentially come within the scope of the indemnity.

2.    **The indemnity provision was valid to the extent it required KIC to be indemnified for wrongful conduct that was partly the fault of KIC.**

Sato also contends that, to obligate Sato to assume KIC's entire defense would be contrary to public policy and Hawaiʻi law, as set forth in HRS § 431:10-222, which provides:

> **§ 431:10-222  Construction industry; indemnity agreements invalid.**  Any covenant, promise, agreement or understanding in, or in connection with or collateral to, a contract or agreement relative to the construction, alteration, repair or maintenance of a building, structure, appurtenance or appliance, including moving, demolition or excavation connected therewith, purporting to indemnify the promisee against liability for bodily injury to persons or damage to property caused by or <u>resulting from the sole negligence or wilful misconduct of the promisee, the promisee's agents or employees, or indemnitee</u>, is invalid as against public policy, and is void and unenforceable; provided that this section shall not affect any valid workers' compensation claim under chapter 386 or any other insurance contract or agreement issued by an admitted insurer upon any insurable interest under this code.

(Emphasis added.)

In the first instance, KIC countered that HRS § 431:10-222 is inapposite because it concerns contracts related to "construction, alteration, repair or maintenance of a building, structure, appurtenance or appliance, including moving, demolition or excavation connected therewith" and not "professional design services."  The Sato Contract, however, included preparation of plans for grading, drainage, roadways, sewage, electricity, construction cost estimates, and site work civil drawings in Sato's scope of work.  Sato's work was "relative to the construction, alteration, repair or maintenance of a building, structure, appurtenance or appliance, including moving, demolition or excavation connected therewith," and thus fell under the provisions of HRS § 431:10-222.

Interpreting language in HRS § 431-453 (1970), which was nearly identical to that of its superseding statute, HRS § 431:10-222, the Hawaiʻi Supreme Court stated: "[n]othing on [HRS § 431-453's] face suggests a subcontractor's promise to indemnify the general contractor against liability resulting from the subcontractor's negligence may be void[.]"  <u>Espaniola v. Cawdrey Mars Joint Venture</u>, 68 Haw. 171, 178, 707 P.2d 365, 370 (1985).  Rather, the statute

> declares invalid a promisor's agreement to indemnify against
> liability flowing from the negligence or misconduct of
> persons other than the promisor, his agents or employees.
> And a departure from the plain and unambiguous language of
> the statute cannot be justified without a clear showing that
> the legislature intended some other meaning would be given
> the language.

Id. at 179, 707 P.2d at 370 (citing Kaiama v. Aguilar, 67 Haw. 549, 553, 696 P.2d 839, 842 (1985)); see also Kole v. Amfac, Inc., 665 F. Supp. 1460, 1465 (D. Haw. 1987) certified question answered, 69 Haw. 530, 750 P.2d 929 (1988) ("In construction contracts, [HRS] § 431-435 [sic] prohibits an indemnitor from indemnifying an indemnitee for the sole negligence of the indemnitee.").

Under Espaniola and Kole, HRS § 431:10-222 would invalidate Sato's promise to indemnify KIC against the "sole negligence or wilful misconduct" of any entities other than Sato. Espaniola, 68 Haw. at 178, 707 P.2d at 370-71; Kole, 665 F. Supp. at 1464-65. HRS § 431:10-222 does not invalidate the indemnification provision in the Sato Contract, under the circumstances of this case, because Arthur's Complaint did not allege that Mona's injuries were solely the result of KIC's negligence.

HRS § 431:10-222 establishes that Sato could not be held liable for the sole negligence or willful misconduct of KIC, but it does not bar Sato's duty to defend, and possibly to indemnify, in this case because Sato, as well as the other defendants were alleged to have been negligent. Thus, this application of HRS § 431:10-222 does not conflict with the circuit court's determination (1) that Sato's duty to defend KIC includes all claims potentially arising under the Sato Contract and not only for those arising from Sato's negligence or wilful misconduct, and (2) as discussed in the prior section, that Sato was liable for defense costs when KIC tendered its defense rather than after a judicial determination of Sato's fault.

In sum, HRS § 431:10-222 restricts the scope of indemnification provisions in construction contracts, but it does not invalidate the application of the provision in the Sato Contract to Arthur's claims here, and Sato's duty to ultimately indemnify KIC and/or others is separate from its duty to defend.

Under Pancakes, Sato's obligation to defend KIC extended to claims that fell outside the scope of Sato's duty to indemnify KIC. Pancakes, 85 Hawai'i at 291, 944 P.2d at 88. For these reasons, we conclude that the indemnification provision in the Sato Contract was not void under HRS § 431:10-222.

**C. Pacific Fence's contentions on appeal**

Pacific Fence appeals from the following orders:

(1) April 27, 2007 "Order Granting in Part and Denying in Part Defendant and Third-Party Plaintiff [KIC's] Motion for Partial Summary Judgment Filed on March 5, 2007";

(2) May 22, 2007 "Order Granting in Part and Denying in Part Defendant [DHHL's] Motion for Partial Summary Judgment Filed January 10, 2007";

(3) August 8, 2007 "Order Granting Third-Party Defendant and Fourth-Party Plaintiff [Kiewit's] Motion for Partial Summary Judgment, Filed Herein on June 8, 2007";

(4) May 27, 2011 "Order Granting Defendant and Third-Party Plaintiff [KIC's] Motion for Partial Summary Judgment Against Fourth-Party Defendant [Pacific Fence] and for Enforcement of Order Granting Motion";

(5) May 27, 2011 "Order Granting Defendant and Third-Party Plaintiff [KIC's] Motion for Partial Summary Judgment Against Defendant [Sato] and Third-Party Defendant [Kiewit] and for Enforcement Order Granting Motion";

(6) May 27, 2011 "Order Granting Defendant and Third-Party Plaintiff [KIC's] Motion for Enforcement of Order Granting in Part and Denying in Part Defendant and Third-Party Plaintiff [KIC's] Motion for Partial Summary Judgment Filed March 25, 2007, as Against Defendant [Design Partners]";

(7) May 27, 2011 "Order Granting Defendant and Third-Party Plaintiff [KIC's] Motion for Enforcement of Order Granting in Part and Denying in Part Defendant and Third-Party Plaintiff [KIC's] Motion for Partial Summary Judgment Filed March 25, 2007, as Against Defendant [Coastal]"; and

(8) October 3, 2011 "Order Granting Third-Party Defendant and Fourth-Party Plaintiff [Kiewit's] Motion for Enforcement Of Order Granting Third-Party Defendant and

Fourth-Party Plaintiff [Kiewit's] Motion for Partial Summary Judgment Filed On July 1, 2011."

Pacific Fence's appeal presents three contentions: (1) that the language of the Pacific Fence Subcontract was not sufficient for Kiewit to "pass through" its duties to defend third parties; (2) that multiple indemnitors had an independent, concurrent duty to defend the indemnitee and must each be allocated defense costs equally on a pro-rata basis; and (3) that an indemnitee, such as Kiewit, should be allocated an independent share of the defense costs where negligence on the part of the indemnitee was alleged.

1.     **Pacific Fence had a duty to defend.**

Pacific Fence's contentions primarily concern the circuit court's grant of Kiewit's June 8, 2007 motion for partial summary judgment, in which the circuit court ordered that "[a]ny obligation Kiewit has to defend KIC and [Sato] passes through Kiewit, as a matter of law, to Pacific Fence." In its motion for partial summary judgment, Kiewit argued that, under the Kiewit Contract, Pacific Fence was responsible for Kiewit's entire defense obligations to KIC, DHHL, and Sato, including defense obligations for work not subcontracted to Pacific Fence, under the complaint allegation rule as interpreted by Pancakes. Kiewit further cited Pancakes for the proposition that Pacific Fence's duty to defend Kiewit, and including parties Kiewit was obligated to defend under the Kiewit Contract, commenced with the filing of Arthur's First Amended Complaint. Kiewit argued that because Arthur's First Amended Complaint made direct allegations of negligent construction of the fence constructed by Pacific Fence, such negligence claims fell within the Pacific Fence Subcontract, and therefore, "any party Kiewit is obligated to defend pursuant to the [KIC] Contract, commenced with the filing of the First Amended Complaint."

Section 11 of the Pacific Fence Subcontract obligated Pacific Fence to KIC, Kiewit, Kiewit's sureties, and:

> any other party required to be indemnified under the [KIC] Contract, jointly and severally, . . .
>
>          . . . .

40

> (b) To defend and indemnify them against and save them harmless from any and all claims, suits, or liability for damages to property including loss of use thereof, injuries to persons, including death, and from any other claims, suits or liability on account of acts or omissions of [Pacific Fence] . . . whether or not caused in part by the active or passive negligence or other fault of a party indemnified hereunder[.]

(Emphases added.)

Pacific Fence contends that the express terms of the Pacific Fence Subcontract restricts the scope of their duty to defend their acts or omissions. Pacific Fence relies on case law from other jurisdictions that rejects a general contractor's attempts to "pass through" liability for its own negligence to a third party. According to Pacific Fence, insurance law on the timing and trigger of the duty to defend under the complaint allegation rule may be properly considered in limited circumstances. Pacific Fence does not contest the circuit court's application of the complaint allegation rule to determine the duty to defend at the outset of litigation. Pacific Fence's contention in regard to this point of appeal is that it is improper "to require a private indemnitor to defend both covered and non-covered claims like an insurer."

Pacific Fence's duty to defend extends to claims that allege negligence "in part" by Kiewit, KIC, and Sato. Pacific Fence states the only claims excluded "from the scope of Pacific Fence's defense obligation are those 'caused by the sole negligence' of Kiewit." See HRS § 431:10-222.

The First Amended Complaint against DHHL, KIC, Design Partners, Coastal, and Sato alleged "[n]egligent design of the hillside area, including the fence and culvert; [n]egligent construction of the hillside area, including the fence and culvert; and [n]egligent supervision of the construction of the hillside area, including the fence and culvert." The scope of Pacific Fence's work under its subcontract included furnishing supervision, labor, tools, equipment, materials, and supplies necessary to construct and install a box culvert and four fences in the Project. Pacific Fence's duty to defend extended to Arthur's claims against DHHL, KIC, and Sato because Arthur alleged acts or omissions that fell within the scope of Pacific Fence's contracted work. Pancakes, 85 Hawaiʻi at 292, 944 P.2d

at 89 ("If a complaint alleges claims that fall within the coverage of the indemnity provision, then, according to the complaint allegation rule, the duty to defend begins.").

2. **KIC did not waive its claim to the defense and indemnification from Pacific Fence.**

Pacific Fence contends that KIC "waived" its claim to a defense or indemnification from Pacific Fence because it did not send a tender of defense letter to Pacific Fence and instead relied on its filing of a cross-claim to give Pacific Fence notice of the tender of the defense. Pacific Fence received KIC's cross-claim on February 9, 2006, nine days after Kiewit filed their fourth-party complaint against Pacific Fence on January 31, 2006. The earliest KIC could have tendered its defense to Pacific Fence was on November 21, 2005, when it was served with Arthur's Complaint. Pacific Fence provided no evidence of prejudice caused by alleged delay in receiving notice of claims that it was obliged to defend KIC. We conclude that KIC did not waive its rights to reimbursement of defense costs.

3. **The contracts did not state that duties to defend "pass-through" to subsequent contractors.**

The circuit court held that "pass through" provisions in the KIC Contract, Kiewit Contract, and Pacific Fence Subcontract required Pacific Fence to defend Kiewit, KIC, DHHL, and Sato, to the exclusion of Kiewit's obligation to defend KIC, DHHL, and Sato. Pacific Fence contended that all indemnitees, including DHHL, "must participate in their own defense for their own independent negligence." This contention is consistent with the result in Pancakes, which required a defendant-indemnitor and a defendant-indemnitee to share the cost of the indemnitee's reasonable attorneys' fees and costs as determined by the trial court. See Pancakes, 85 Hawai'i at 289-90, 944 P.2d at 86-87. Requiring contribution from multiple defendants is even more appropriate in the instant case, which unlike Pancakes, involves a chain of indemnitee and indemnitor parties.

Pacific Fence contended that Pancakes did not require that an indemnitor be solely responsible for the defense of an indemnitee where there are other indemnitors with concurrent

obligations to defend or where the indemnitee itself is independently negligent.

The circuit court's finding that KIC's duty to defend DHHL passed through KIC to Kiewit was based on the Kiewit Contract, which provided: "To the fullest extent permitted by law, [Kiewit] shall indemnify, defend, and hold harmless [KIC], . . . [Sato], . . . [and DHHL] . . . from and against all claims, damages, losses, and expenses . . . resulting from or attributable to . . . the performance of the Work and [Kiewit's] duties under the Contract Documents[.]" The circuit court also considered the terms of contracts KIC made with Kiewit, Coastal, Design Partners, and Sato to determine whether duties to defend "pass[ed] through" to subsequent contractors.

> 2. Based upon the allegations in [Arthur's] First Amended Complaint and the terms of their respective contracts with [KIC], [Design Partners] and Coastal have a joint and several duty, as a matter of law, to defend KIC with respect to the claims asserted herein against KIC;
>
> 3. Based upon the terms of their respective contracts with [KIC], [KIC's] duty to defend [DHHL] passes through, jointly and severally, to . . . Coastal and [Kiewit] as a matter of law;
>
> 4. Based upon the terms of their respective contracts with [KIC], [KIC's] duty to defend [DHHL] _does not_, as a matter of law, pass through to [Design Partners] and Sato.

(Emphasis added.)

Under provisions in the Sato Contract and Design Partners Contract with KIC respectively, Sato and Design Partners "agree[d] to indemnify, defend, and hold harmless [KIC] and its officers, directors and employees[.]" By contrast, indemnity provisions in the Coastal Contract and Kiewit Contract with KIC required Kiewit and Coastal to "indemnify, defend, and hold harmless [KIC], . . . [Sato], . . . [and DHHL.]" The circuit court's consideration of contractual language was proper "[b]ecause the insurer's duty to defend its insured is contractual in nature, we must look to the language of the policy involved to determine the scope of that duty." Hawaiian Holiday Macadamia Nut Co. v. Indus. Indem. Co., 76 Hawai'i 166, 169, 872 P.2d 230, 233 (1994).

Pacific Fence concedes that it had an obligation to defend Kiewit, but contends that Kiewit had an independent duty

to defend itself, KIC, Sato, and DHHL that did not "pass through" to Pacific Fence.  Under section 3.18.1 of the Kiewit Contract, Kiewit had a duty to indemnify, defend, and hold harmless KIC, Sato, and DHHL "from and against claims, damages, losses, and expenses, including but not limited to attorney's fees, arising out of or resulting from [work contracted to Kiewit.]"  In granting Kiewit's motion for enforcement of the order granting its motion for partial summary judgment, the circuit court ordered that "Kiewit's obligation to reimburse [KIC] and/or make future payments for KIC's defense fees and costs . . . passes through Kiewit as a matter of law to Pacific Fence"; and required Pacific Fence to "reimburse KIC for the pro rata share of defense fees and costs allocated to Kiewit within the time period requirement under the [May 27, 2011 "Order Granting [KIC's] Motion for Partial Summary Judgment Against [Sato and Kiewit] and for Enforcement of Order Granting Motion"].

Section 11 of the Pacific Fence Subcontract required Pacific Fence to defend and indemnify indemnitees "from any and all claims, suits or liability for damages to property including loss of use thereof, injuries to persons, including death, and from any other claims, suits or liability on account of acts or omissions of [Pacific Fence] . . . whether or not caused in part by the active or passive negligence or other fault of a party indemnified hereunder[.]"  Pacific Fence's duties to defend encompassed conduct alleged in the complaint that potentially arose under the agreement.  See Pancakes, 85 Hawai'i at 293, 944 P.2d at 91.  Pacific Fence's duty to defend was "limited to situations where the pleadings have alleged claims for relief that fall within the terms for coverage of the insurance contract.  Where pleadings fail to allege any basis for recovery within the coverage clause, the insurer has no obligation to defend."  Pancakes, 85 Hawai'i at 291, 944 P.2d at 88 (citation, internal quotation marks, and brackets omitted.)

Hawai'i requires contracts of indemnity be "strictly construed, particularly where the indemnitee claims that it should be held safe from its own negligence."  Keawe v. Hawaiian Elec. Co., 65 Haw. 232, 237, 649 P.2d 1149, 1153 (1982) (citing

Kamali v. Hawaiian Elec. Co., 54 Haw. 153, 161, 504 P.2d 861, 866 (1972)). Hawai'i has scrutinized contracts that allegedly hold safe an indemnitee from its own negligence for "a clear and unequivocal assumption of liability by [the indemnitor] for [the indemnitee's] negligence." Kamali, 54 Haw. at 162, 504 P.2d at 866. Strictly construing the Pacific Fence Subcontract indemnity provision, we conclude that it did not extend to Kiewit's liability unless it arose at least in part from Pacific Fence's work under their subcontract.

Pacific Fence's obligations were not coextensive with KIC's obligations to DHHL under Section 17 of the KIC Contract and were not coextensive with Kiewit's obligations to KIC under Section 3.18.1 of the Kiewit Contract. Section 11 of the Pacific Fence Subcontract obligated Pacific Fence "[t]o assume towards [Kiewit] all obligations and responsibilities that [Kiewit] assumes toward [KIC] and others, as set forth in the [Kiewit] Contract, insofar as applicable, generally or specifically, to [Pacific Fence's] Work." We interpret this clause to mean that Pacific Fence assumed a duty to defend those whom Kiewit was obligated to defend under the Kiewit Contract, but only insofar as applicable to Pacific Fence's work.

Pacific Fence's alleged acts or omissions, as set forth in Arthur's Complaint, were the basis for its duties to defend itself as well as portions of the defense of its contractors insofar as their liabilities potentially arose from Pacific Fence's acts or omissions. Pacific Fence is not liable for portions of Kiewit's independent contractual obligation to defend DHHL, Sato, and KIC that arose from its decision to enter the Kiewit Contract and those obligations do not "pass through" to Pacific Fence. The lack of clear language in the Pacific Fence Subcontract expressly stating that Pacific Fence would assume all liabilities for Kiewit's duties to defend KIC, DHHL, and Sato against omissions or acts arising out of Kiewit's work indicates that Kiewit retained an independent duty to defend Kiewit, KIC, DHHL, and Sato, and that this duty did not exclusively pass through to Pacific Fence. Therefore, Kiewit has an independent duty to defend DHHL and KIC and should contribute to defense

costs of DHHL and KIC, as well as the cost of its own defense in the <u>Arthur</u> litigation.

For these reasons, and those discussed elsewhere in this opinion, we conclude that Pacific Fence did not assume duties to defend Kiewit, KIC, Sato, and DHHL to the exclusion of these other parties' independent obligations to also contribute to defense costs.

**4. The Pacific Fence Subcontract is not void under HRS § 431:10-222.**

Pacific Fence contends that Kiewit and the circuit court interpreted subcontract indemnity provisions to require Pacific Fence to indemnify Kiewit and other indemnified parties against their own negligence. This, Pacific Fence contends, is a violation of public policy and other case law that prohibits indemnification of an indemnitee's own negligence.

Pacific Fence contends that agreements which require subcontractors to indemnify general contractors against the general contractor's "sole negligence" are void as against public policy. The Pacific Fence Subcontract excluded Pacific Fence from its duty to defend and indemnify acts or omissions caused by the "sole negligence" of Kiewit. However, Pacific Fence does not contend that the alleged acts or omissions in Arthur's complaints were solely attributable to Kiewit and therefore the Pacific Fence Subcontract was not void under HRS § 431:10-222.

**5. Joint and several provisions in the Pacific Fence Subcontract required contribution from other parties.**

Our conclusion that Kiewit had an independent duty to defend KIC and DHHL that did not pass through to Pacific Fence accords with the express language of the Pacific Fence Subcontract. The Pacific Fence Subcontract provides that Kiewit, Kiewit's surety, KIC, and "any other party required to be indemnified under the Kiewit Contract" would be liable, "jointly and severally . . . [t]o defend and indemnify . . . ."

Under the Pacific Fence Subcontract, KIC, Sato, and Kiewit had a joint and several obligation to defend against claims arising from Pacific Fence's acts or omissions, even where one of the indemnitees was part of the cause of the negligent act

or omission. The circuit court's October 3, 2011 "Order Granting [Kiewit's] Motion for Enforcement of Order Granting [Kiewit's] Motion for Partial Summary Judgment Filed on July 1, 2011" required Pacific Fence to reimburse KIC for the pro rata share of defense fees and costs allocated to Kiewit under the May 27, 2011 order granting KIC's motion for partial summary judgment against Sato and Kiewit. In one of its May 27, 2011 orders, however, the circuit court calculated Kiewit's pro rata share of defense obligations without considering Sato's and KIC's joint and several duty to participate in the defense under the Pacific Fence Subcontract.

## D. Coastal's Cross-appeal

Coastal appeals from three circuit court orders: (1) the May 22, 2007 "Order Granting Part and Denying in Part ['DHHL's Motion for Partial Summary Judgment'], Filed January 10, 2007," which concluded that no genuine issue of material fact concerning DHHL's right to a defense by KIC existed; (2) the April 27, 2007 "Order Granting in Part and Denying in Part [KIC's] Motion for Partial Summary Judgment Filed on March 5, 2001," which concluded that KIC's duty to defend DHHL passed through, jointly and severally, to Coastal and Kiewit; and (3) the May 27, 2011 "Order Granting [KIC's] Motion for Enforcement of the Order Granting in Part and Denying in Part [KIC's] Motion for Partial Summary Judgment Filed March 25, 2007, as Against [Design Partners]."

Similar to Pacific Fence's contentions regarding pro-rata allocation of defense costs amongst Defendant Parties, Coastal contends that KIC should be required to contribute to DHHL's defense costs, "along with Coastal, Kiewit, and Pacific Fence, rather than imposing its share of those costs on Coastal and Kiewit."

Coastal contends KIC was not obliged to defend DHHL against its own negligence and could not pass that duty on to others; that their duty to defend was narrower than an insurer's duty to defend; and that apportioning defense costs amongst the Defendant Parties would implement this narrower duty.

1.  **Coastal owed a duty to defend KIC and DHHL up until the circuit court granted summary judgment in favor of Coastal on February 25, 2010.**

Coastal contends it did not owe a duty to defend DHHL or KIC because alleged negligent acts or omissions could not have arisen from its work on the Project and, therefore, the circuit court erred by granting KIC summary judgment on Coastal's duty to defend. Coastal contends that in the First Amended Complaint, Arthur was "mistaken" and had "misidentified" Coastal as the general contractor. Coastal states that "[Arthur] had simply assumed that Coastal was the contractor responsible for grading and site improvements." Arthur's First Amended Complaint identified Coastal as "the General Contractor for this development" and did not name Kiewit as a defendant. Coastal asserts KIC and other Defendant Parties knew that it was Kiewit and not Coastal, who was responsible for the grading and site improvements that were the subject of Arthur's First Amended Complaint. Together with the narrower duty to defend that is applied in the context of non-insurance contracts, this meant that "the allegations of the complaint did not warrant a finding by the [circuit] court that Coastal owed KIC or the DHHL any defense, let a lone [sic] a defense against all claims asserted against either of them."

The circuit court's February 25, 2010 Order Granting Coastal's Renewed Motion for Summary Judgment, as well as subsequent orders addressing Coastal's limited liability for a duty to defend, found Coastal had a duty to defend DHHL and KIC until Coastal was granted summary judgment.
The circuit court also determined that Coastal's acts or omissions fell outside of the scope of claims "arising out of, resulting from or attributable to" Coastal's work under section 3.18.1 of the Coastal Contract. On May 22, 2007, the circuit court denied Coastal's first motion for summary judgment on Arthur's First Amended Complaint, finding issues of fact as to whether Coastal's scope of work might have included responsibility for the debris fence and drainage culvert. Therefore, the circuit court did not err in denying Coastal's

first motion for summary judgment.

Coastal's contention that it owed no duty to defend is complicated by its agreement to settle its liability for a duty to defend KIC. On June 9, 2011, Coastal filed a "Petition for Determination of a Good Faith Settlement" under which it paid $47,500 to KIC for defense costs. The circuit court granted this petition on November 17, 2011.

We need not address Coastal's contention that it owed no duty to defend DHHL or KIC. Coastal does not (1) argue that the lack of nexus between its work on the Project and Arthur's Complaint negated the basis for granting KIC's motion for summary judgment, or (2) indicate whether and how this argument was raised to the circuit court. Coastal's opening brief was required to present an "argument" that contained its contentions and citations to authorities and parts of the record relied upon, but did not do so. See HRAP Rule 28(b)(7). Coastal was also required to set forth points of error in its brief that stated "where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court . . . ." HRAP Rule 28(b)(4)(iii). In light of the particular circumstances under which Coastal's duty to defend was invoked in this case, Coastal's subsequent agreement to settle the issue of its liability for a duty to defend, and because Coastal failed to properly present its points of circuit court error or argument, we disregard this contention. See HRAP Rule 28(b).

### 2. Coastal's obligation to defend extended to claims potentially arising under the Coastal Contract.

Coastal contends the circuit court erred by concluding that Coastal agreed to assume KIC's obligations to DHHL under the indemnity clause of the Coastal Contract, section 3.18.1, does not contain an express assumption of KIC's obligations to DHHL and was not intended to operate as a "conduit" for assuming KIC's obligations. KIC's obligations to DHHL arose under Section 17 of the KIC Contract, which provided that KIC would defend DHHL against claims related to sales, construction, or design of the Project within a year of completion; claims based on non-

49

disclosure or inadequate disclosure of risks; and legal actions arising from KIC's development and construction work. The KIC Contract indicates, however, that KIC would not defend against DHHL's negligent acts or omissions related to the Project.

Coastal correctly asserts that KIC did not add a provision expressly stating that Coastal would assume KIC's duties to defend DHHL. Further, while broader than a duty to indemnify, the duty to defend arises "whenever any of the claims asserted may potentially come within the scope of an indemnity agreement, and the defense must continue until it is clear that the liability cannot possibly come within the scope of the indemnity." Indemnification and Insurance, 79 Pa. B. Ass'n Q. 156 at 178. Therefore, Coastal's duty to defend KIC and others extended to all of Arthur's claims that potentially arose under the Coastal Contract. See Pancakes, 85 Hawai'i at 293, 944 P.2d at 91.

Section 3.18.1 of the Coastal Contract required Coastal to defend KIC and DHHL against claims "arising out of, resulting from or attributable to . . . the performance of the Work and [Coastal's] duties under the Contract Documents[.]" Like Kiewit, Coastal contracted to defend KIC and DHHL for all claims "arising out of, resulting from, or attributable to . . . the performance of the Work and [Coastal's] duties under the Contract Documents, caused in whole or in part by any negligent act or omission . . . ." Coastal contends that it did not intend to assume KIC's obligations to DHHL, which is why section 3.18.1 specified it would defend only such claims.

KIC argued to the circuit court that its intent in including indemnification provisions in its contracts "was to pass the duty to indemnify and defend against any third-party claims, including those of [Arthur] and DHHL, to the persons or entities performing the actual design and construction work from which a claim might be made." Coastal contends that "the principal purpose of the [Coastal] Contract was not to provide for the defense and indemnity of KIC but instead to provide a contractor for the [Project] that would build houses for that project."

Coastal contends the Coastal Contract specified it could only be liable for claims arising from the scope of Coastal's contracted work. Coastal argues that "in construction-related litigation involving duties to defend arising between and among multiple defendants, a trial court should apportion defense costs on the basis of the claims that arise from or are attributable to the defendants' respective scope of work." Kiewit contends that Coastal's suggested rule would require "overturn[ing]" Pancakes and First Ins. Co. of Hawaii, v. State, by Minami, 66 Haw. 413, 665 P.2d 648 (1983), insofar as the rule is applicable to "situations where the express language of the indemnity provision does not limit the defense to the indemnitor's scope of work." We disagree.

Pancakes held a duty to defend encompasses "claims [raised in a complaint] that fall within the coverage of the indemnity provision[.]" Pancakes, 85 Hawai'i at 292, 944 P.2d at 89. Only those claims that could potentially be attributable to the contracted work fall under the indemnity provisions in contracts under review in the instant case. As discussed in regard to Pacific Fence's appeal, apportionment amongst indemnitor-parties as well as the indeminitee-defendant is consistent with Pancakes. A duty to defend and indemnify cannot be passed off entirely onto a subsequent contractor because that duty arises whenever a claim is made against acts or omissions attributable to the indemnitor's work. The Coastal Contract, like the Pacific Fence Subcontract, did not provide that Coastal would assume KIC's duties to defend DHHL to the exclusion of KIC's or DHHL's potential liability for its own negligence or willful acts. The Costal Contract provides:

> [Coastal] shall indemnify, defend, and hold harmless [KIC], . . . [Sato], . . . [DHHL] . . . from and against all claims, damages, losses, and expenses, including but not limited to attorneys' fees, arising out of, resulting from or attributable to (1) the performance of the Work and [Coastal's] duties under the Contract Documents, caused in whole or in part by any negligent act or omission of [Coastal], a Subcontractor, . . . or anyone for whose acts they may be liable, regardless of whether such claim, damage, loss, or expenses is caused in part by a party indemnified hereunder[.]

Under this provision, Coastal was obligated to

contribute to the defense of DHHL, shared with Sato, Kiewit, Pacific Fence, KIC, and DHHL; and the defense of KIC, shared with Kiewit, Pacific Fence, and Sato. Although Coastal is required to defend and indemnify KIC and DHHL, KIC is also obliged to provide a share of the defense of DHHL based on the independent duty created by the KIC Contract.

As Coastal properly contends, DHHL also had an independent duty to participate in its own defense under Section 17 of the KIC Contract, the last paragraph of which specified "Section 17 shall not cover the negligence or willful acts, omissions, failure to act, or misconduct of [DHHL] either related to the development of this Project or related to the completion of [DHHL's] authorized mission." (Emphasis added.)

### III.  CONCLUSION

We vacate in part and affirm in part the Circuit Court of the First Circuit's Amended Final Judgment, filed on April 2, 2013, and remand this case for further proceedings consistent with our decisions on the orders, partial summary judgments, and summary judgments appealed from as specified supra.

In regard to Arthur's appeal, the circuit court's September 8, 2010 "Order Granting Defendant Kalawahine Streamside Association's Motion For Summary Judgment On Any And All Claims Asserted By Plaintiffs Due To Lack Of Causation Filed on April 8, 2010" is vacated. The May 24, 2010 "Order Granting Defendant and Third-Party Plaintiff Kamehameha Investment Corporation's Motion for Partial Summary Judgment as to Plaintiffs' Claim for Punitive Damages filed on March 2, 2010" and the August 26, 2010 "Order Denying Plaintiff Arthur's Motion For Leave To File Complaint Over and Against Third-Party Defendant Kiewit Pacific Co. Filed on March 9, 2010" are affirmed.

In regard to appeals taken by Pacific Fence and cross-appeals by Sato and Coastal, we vacate the following circuit court orders and remand this case for further proceedings to newly determine Defendant Parties' respective liabilities for their duties to defend under the KIC Contract, Sato Contract, Design Partners Contract, Kiewit Contract, Coastal Contract, and

the Pacific Fence Subcontract:[6]

(1) the April 27, 2007 "Order Granting in Part and Denying in Part Defendant and Third-Party Plaintiff Kamehameha Investment Corporation's Motion for Partial Summary Judgment Filed on March 5, 2007";

(2) the May 22, 2007 "Order Granting in Part and Denying in Part 'Defendant State of Hawai'i, Department of Hawaiian Home Lands' Motion for Partial Summary Judgment' Filed January 10, 2007";

(3) the August 8, 2007 "Order Granting Third-Party Defendant and Fourth-Party Plaintiff Kiewit Pacific Co.'s Motion for Partial Summary Judgment, Filed Herein on June 8, 2007";

(4) the May 27, 2011 "Order Granting Defendant and Third-Party Plaintiff Kamehameha Investment Corporation's Motion for Partial Summary Judgment Against Fourth-Party Defendant Pacific Fence, Inc. and for Enforcement of Order Granting Motion";

(5) the May 27, 2011 "Order Granting Defendant and Third-Party Plaintiff Kamehameha Investment Corporation's Motion for Partial Summary Judgment Against Defendant Sato & Associates, Inc. and Third-Party Defendant Kiewit Pacific Co. and for Enforcement Order Granting Motion";

(6) the May 27, 2011 "Order Granting Defendant and Third-Party Plaintiff Kamehameha Investment Corporation's Motion for Enforcement of Order Granting in Part and Denying in Part Defendant and Third-Party Plaintiff Kamehameha Investment Corporation's Motion for Partial Summary Judgment Filed March 25, 2007, as Against Defendant Design Partners, Inc.";

(7) the May 27, 2011 "Order Granting Defendant and Third-Party Plaintiff Kamehameha Investment Corporation's Motion for Enforcement of Order Granting in Part and Denying in Part Defendant and Third-Party Plaintiff Kamehameha Investment

---

[6] The "Order Granting Coastal Construction Co., Inc.'s Renewed Motion for Summary Judgment on the First Amended Complaint (Filed November 8, 2005), Including Any Pending Amendment and Defendant and Third-Party Plaintiff Kamehameha Investment Corporation's Conditional Substantive Joinder" filed on February 25, 2010 is affirmed and consistent with this order, Coastal's liability for its duty to defend KIC and DHHL ended on February 25, 2010.

Corporation's Motion for Partial Summary Judgment Filed March 25, 2007, as Against Defendant Coastal Construction Co., Inc."; and

(8) the October 3, 2011 "Order Granting Third-Party Defendant and Fourth-Party Plaintiff Kiewit Pacific Co.'s Motion for Enforcement Of Order Granting Third-Party Defendant and Fourth-Party Plaintiff Kiewit Pacific Co.'s Motion for Partial Summary Judgment Filed On July 1, 2011."

Gary Y. Okuda
(Lester K.M. Leu and
Karyn A. Doi with him on the
briefs)
(Leu Okuda & Doi)
and
Leighton K. Lee
for Plaintiffs/Appellees/ Appellants/
Cross-Appellees William A. Arthur, Sr.,
individually and the Estate of Mona
Arthur, through William A. Arthur,
as Personal Representative.

Michael N. Tanoue
(Eric H. Kunisaki
(The Pacific Law Group)
and
Robert P. Richards
(Hughes Richards & Associates) with
him on the briefs)
for Fourth-Party Defendant/Appellant/
Appellee/Cross-Appellee Pacific
Fence Inc.

Michiro Iwanaga
(Wayne M. Sakai and
Max J. Kimura with him on the briefs)
(Sakai Iwanaga Sutton)
for Defendant/Appellee/Cross-Appellant
Coastal Construction Co., Inc.

Kevin P.H. Sumida
(Anthony L. Wong and
Lance S. Au with him on the briefs)
(Kevin Sumida & Associates)
and
Jane Kwan
(Frank K. Goto, Jr. and
Bennett J. Chin with her on the briefs)
(Law Offices of Frank K. Goto, Jr.)
for Defendants/Appellees/Cross-Appellants
Sato and Associates, Inc. and
Daniel S. Miyasato.

Arthur H. Kuwahara
(Kim & Kuwahara)
for Defendant/Appellee/Cross-Appellee/
Appellant Design Partners, Inc.

Wade J. Katano
(Jonathan L. Ortiz with him on the
brief)
(Wade & Katano)
for Defendant/Appellee Association of
Kalawahine Streamside Association.

Brad S. Petrus
(Joseph F. Kotowski, III, David R.
Harada-Stone, and Lyle M. Ishida
with him on the briefs)
(Tom Petrus & Miller)
for Defendant/Appellee/Third Party
Plaintiff/Cross-Appellee Kamehameha
Investment Corporation.

Greg H. Takase
(Takase & Takase of counsel)
(Cary T. Tanaka and
Dawn N. Nakagawa
(Law Offices of Cary T. Tanaka)
with him on the brief)
and
Wesley H.H. Ching
(Sheree Kon-Herrera with him
on the brief)
(Fukunaga Matayoshi Hershey & Ching)
for Third-Party Defendant/Appellee/
Fourth-Party Plaintiff/Cross-Appellee
Kiewit Pacific Company.

Randall Y. Yamamoto
(Brian Y. Hiyane with him on the
brief)
(Kawashima Lorusso)
for Defendant/Appellee/Third Party
Plaintiff/Cross-Appellee State of
Hawaiʻi Department of Hawaiian
Home Lands.